### KENTUCKY & I. BRIDGE Co. *v.* LOUISVILLE & N. R. Co.

(*Circuit Court, D. Kentucky.   January 7, 1889.*)

1. CARRIERS — INTERSTATE COMMERCE COMMISSION — CONSTITUTIONAL LAW — JUDICIAL POWERS.

   Congress, in establishing "inferior courts," and prescribing their jurisdiction, must confer upon the judges appointed to administer them the constitutional tenure of office,—that of holding "during good behavior,"—before they can become invested with any portion of the judicial power of the government.

2. SAME.

   The act to regulate commerce does not undertake either to create an "inferior court," or to invest the commission appointed thereunder with judicial powers or functions.

3. SAME.

   The interstate commerce commission is invested with only administrative powers of supervision and investigation, which fall far short of making it a court, or its action judicial, in the proper sense of the term.   Its action or conclusion upon matters brought before it for investigation is neither final nor conclusive; nor is it invested with any authority to enforce its decision or award.   It hears, investigates, and reports upon complaints made before it, but subsequent judicial proceedings are contemplated and provided for as the remedy for the enforcement of the order or report of the commission in all cases where the party against whom its decision is rendered does not yield voluntary obedience thereto.

4. SAME—EFFECT OF REPORT.

   The commission is charged with the duty of investigating and reporting upon complaints; and the facts found or reported by it are only given the force and weight of *prima facie* evidence in such judicial proceedings as may thereafter be had for the enforcement of its recommendation or order.   The functions of the commission are those of referees or special commissioners, appointed to make preliminary investigation of, and report upon, matters for subsequent judicial examination and determination.   In respect to interstate commerce matters covered by the law, the commission may be regarded as the general referee of each and every circuit court of the United States upon which the jurisdiction is conferred of enforcing the rights, duties, and obligations recognized and enforced by said law.

5. SAME—POWER OF CONGRESS.

   Congress, under its sovereign and exclusive power to regulate commerce among the several states, has the power to create a commission for the purpose of supervising, investigating, and reporting upon matters or complaints connected with or growing out of interstate commerce; and no valid constitutional objection can be urged against making the findings of the commission *prima facie* evidence in subsequent judicial proceedings.   Such a provision merely prescribes a rule of evidence, clearly within well-recognized powers of the legislature, and in no way encroaches upon the court's proper functions.

6. SAME—POWER OF CIRCUIT COURT.

The act does not make the circuit court the mere executioner of the commissioners' order or recommendation, so as to impose upon the court a nonjudicial power. The court is not restricted to the mere ministerial duty of enforcing an order of the commission. The suit in this court is, under the provisions of the act, an original and independent proceeding, in which the commissioners' report is made *prima facie* evidence of the matters or facts therein stated. The court is not confined to a mere re-examination of the case as heard and reported by the commission, but hears and determines the cause *de novo*, upon proper pleadings and proofs; the latter including not only the *prima facie* facts reported by the commission, but all such other and further testimony as either party may introduce, bearing upon the matters in controversy.

7. SAME—JURISDICTION—CITIZENSHIP.

The right asserted by petitioner arises and is claimed under a law of the United States which relates to a subject over which congress has exclusive control; and this is sufficient to sustain the court's jurisdiction, independent of the citizenship of the parties to the controversy, since it involves a federal question.

8. SAME—COMMON CARRIERS—BRIDGE COMPANIES.

Where a railway company, by contract with a bridge company, acquires the right to use a bridge, with its approaches, for the engines, cars, and trains of the railway company, the first section of the "act to regulate commerce" regards the railway company as the owner or operator of the bridge and approaches, for the time being, as to all freight transported by the railway company over the bridge; and as to all such traffic, the railway company, and not the bridge company, must be regarded as the common carrier. Such a bridge company is not, either in law or in fact, a common carrier of interstate traffic, within the scope and meaning of said section; and it cannot invoke the provisions of said act, to compel railway companies to transact business with or through such bridge company. Between such a bridge company, and the railway carriers of the country, the act establishes no such reciprocal relations, duties, and obligations·as require the latter to form business connections with the former.

9. SAME—TRANSFER COMPANIES—SWITCHING CARS.

Where a corporation, which is under no legal obligation to do so, voluntarily contracts to switch cars over its tracks, between two or more railways, for which service it collects a certain switching charge for switching the cars, loaded or empty, but charges no traffic rates on the freight transported or transferred in the cars, such corporation, in the performance of such service, assumes none of the responsibilities of a common carrier, but only those of a switchman. In respect to cars or traffic thus handled, such corporation can only be regarded as a switchman, or transfer company; and it is no more a common carrier of interstate commerce or traffic, within the provisions of the law, than a city transfer company, which checks a passenger's baggage at the hotel where it is received, and carries it, for an agreed compensation, to the station of the railway over which it is to be transported into another state.

10. SAME—BRIDGE COMPANIES—CHARGES FOR TRANSFER.

When a bridge company, owning no freight cars of its own, solicits freight for railway companies, who will furnish the cars, and over whose lines the freight is to go, and merely transfers such cars over its bridge, delivering them to the railway companies furnishing the same, and charging for its service its regular bridge-toll, but making no charge for transporting the freight contained or carried in the cars, such a bridge company is not a common carrier of such interstate freight. The object and purpose of the bridge company in thus constituting itself the soliciting agent for the railway companies who are willing to provide the cars for the freight it may secure, is manifestly to obtain tolls for the use of its bridge; and the law does not require the railway companies to keep up such an arrangement with the bridge company, in order to protect its interest in securing tolls for its bridge.

11. SAME—TRANSPORTATION CHARGES—TOLLS.

Where the charter of a bridge company makes its bridge and approaches thereto, such as it had authority to construct, a public thoroughfare or highway for the use of which by railroads, or street cars, wagons, vehicles, animals, and foot-passengers it was authorized to charge "reasonable tolls," for

the collection of which suitable toll-gates could be established, the word "tolls," as used in such a charter, is strictly applicable to charges for the use of its highway, rather than to compensation for transportation services which the bridge company may perform or be permitted to render.

12. SAME—CONSTRUCTION OF CHARTER.

Where the charter of a bridge company confers upon it the franchises and powers of building, maintaining, and operating its bridge and approaches, designated as its terminal facilities, such franchises and powers do not, in and of themselves, constitute the bridge company a common carrier of property: on the contrary, they are appropriately confined to the erection, operation, and maintenance of a thoroughfare or public highway, open to the use of others, common carriers and private parties, upon making compensation therefor in the shape of "reasonable tolls."

13. SAME.

The charter powers of said company, neither expressly nor by any clear implication, confer upon it authority, "to equip its road, and to transport goods and passengers thereon, and charge compensation therefor;" nor do they in any way constitute said company a common carrier, the rule of construction applicable to such charters being that "no power is conferred upon a corporation which is not given expressly, or by clear implication."

14. SAME—CONNECTING CARRIERS—INTERCHANGE OF TRAFFIC.

Where the charter of a railroad company provided "that any and all such railroad or railroads hereafter constructed may connect and join with the road hereby contemplated," the connection thus authorized is a physical and not a business connection, and it does not require an interchange of traffic at the point of junction.

15. SAME—COMBINATIONS TO PREVENT CONTINUOUS CARRIAGE.

The seventh section makes it unlawful for any common carrier, subject to the provisions of the act, "to enter into any combination, contract, or agreement, express or implied, to prevent, by change of time-schedule, carriage in different cars, or by other means or devices, the carriage of freights from being continuous from the place of shipment to the place of destination," etc. It is no violation of said section for a railroad company to enter into contracts with other companies for the establishment of through routes, and through rates, for the continuous carriage of interstate traffic. Such contracts are in nowise inconsistent with the things forbidden by said section.

16. SAME—CONNECTING CARRIERS—REASONABLE, PROPER, AND EQUAL FACILITIES.

The second clause of the third section provides that "every common carrier subject to the provisions of this act shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers and property to and from their several lines and those connecting therewith, and shall not discriminate in their rates and charges between such connecting lines," etc.: but neither this nor any other provision of the law requires of the common carrier of interstate commerce the duty of either forming new connections, or of establishing new stations for the reception and delivery of freights. The act to regulate commerce deals with such common carriers as it finds them, and leaves to them full discretion as to what extensions they will make of their lines, the connections they may form, and the yards and depots they may choose to establish. When railroad companies, in compliance with their charter obligations, have provided themselves with convenient, suitable, and ample stations and depots for the accommodation of their business, the law imposes upon them no duty, either to the public or other railroad lines, of making new stations, yards, or depots, even though such additional constructions might be for the convenience of the public or of other carriers. Congress has certainly not undertaken—even if it possessed the power—to deal with such matters.

17. SAME.

When a new railroad makes a physical connection with an old railroad at a point other than the established yard or depot of the old road, but neither company has any yard, station, depot, or ground, at the point of connection, nor any buildings, sheds, or platforms there for the reception and accommodation of freights to be handled and exchanged at that point, nor any clerks or employes stationed there for the inspection of cars, reception of freights,

etc., an interchange of traffic at such a point cannot be made in a proper and convenient way to either company; and no authority is conferred upon the commission or upon this court to compel the old company to provide at said point of connection the same or equal facilities which it had previously provided at its regular, established yards and depots.

18. SAME.

Where a new railroad makes a physical connection with an old railroad, at a point other than the established yard or depot of the old road, and there are no facilities at said connection for receiving, forwarding, or delivering freight, individual shippers or consignees of freight have no right to require the old company to receive or deliver their traffic at such point of connection; and the new company, or other companies using its tracks, cannot properly demand or require of the old company to concede to it or them rights and facilities which the old company is under no obligation or duty to grant or provide for individual owners or shippers of interstate commerce. This would be conferring upon common carriers engaged in transporting interstate traffic rights and privileges superior to those intended for the benefit of such commerce itself. The law was not designed to advance the interests of carriers, but was intended for the benefit and advantage of the commerce they transported; and the provisions of the act all look to that as its object and purpose.

19. SAME—UNDUE OR UNREASONABLE PREFERENCES.

The fact that a railroad company interchanges traffic with certain railroads, at its regular, established yard or depot, (where it has provided all reasonable, proper, and equal facilities for that purpose,) and refuses to interchange traffic with a new road at a point of connection where no such facilities exist, does not constitute any "discrimination," or any "undue or unreasonable preference or advantage," in favor of the railroads with which such interchange is made.. The third section of the act does not mean that whatever facilities a railroad company may furnish or provide for the interchange of business with connecting lines at any one place, (such as its regularly established and properly equipped depot,) it is bound to provide for any and all other railroads at such other and different points as they may select in making their connection. On the contrary, said section means that where a railroad subject to the provisions of the act has provided and established at any given place its facilities in the shape of yards, stations, and depots for the interchange of traffic, or for the receiving, forwarding, and delivering of passengers and property, and there affords such facilities to some of its connecting lines, it shall not deny to other connecting lines at that point the same proper, reasonable, and equal facilities.

20. SAME.

It by no means follows because certain facilities for the interchange of freight are furnished by a railroad to another connecting line or lines at one point, upon certain terms, conditions, and considerations, and where ample accommodations for the transaction of such business are provided and maintained at the joint expense of the companies using them, that another company, making a physical connection with the road furnishing such facilities at another, different, and distant place is entitled to demand at said different point of connection the same or equal facilities. The company making the physical connection, at a point other than that at which the established road has already provided its facilities, and conducts its interchange with other connecting lines, cannot demand or require an interchange at such point of physical connection without first furnishing at such point reasonable and proper facilities for the interchange sought. In cannot rely upon the terminal facilities at another point of the road with which it has formed the physical connection; nor can it compel the road with which the connection is made to join with it in the expense of providing at that point the facilities necessary and proper for the interchange.

21. SAME—SIMILAR OR DISSIMILAR CIRCUMSTANCES.

No provision of the act confers equal facilities upon connecting lines, under dissimilar circumstances and conditions. On the contrary, even as to interstate commerce itself, the distinction is recognized throughout the law between discriminations and preferences which are just and reasonable and those which are unjust and unreasonable, according as they are made or given under similar or dissimilar circumstances and conditions. All discriminations and preferences are not forbidden or made unlawful, but only such as are un-

just, or undue, or unreasonable. In each and every case, therefore, the question whether a discrimination is unjust, or a preference is undue or unreasonable, either as to the common carrier or the commerce it may transport, involves a consideration of the circumstances and conditions under which such discrimination or preference is made or given.

22. SAME—TERMINAL FACILITIES—CHANGE OF CONNECTING POINT.

An interchange of traffic at a new point of connection between railroads, where there are no buildings, sheds, platforms, or other facilities for the proper care, protection, and handling of freight, and no clerks or employes stationed there to look after and attend to the business, cannot possibly be carried on without requiring the old road to concede the use of its track and terminal facilities to the new road, or without imposing upon the old road the trouble, inconvenience, and expense of handling the traffic interchanged between them; and neither the commission nor this court has any authority to require the old road to concede the use of its tracks and terminal facilities in order to accomplish an interchange of traffic: nor can this court or the commission impose upon the old road the duty of making such interchange at its own expense, over its own tracks, with its own engines, at its own yard, and with its own employes. Such interchanges between railroads are arranged by mutual agreements, fixing the compensation to be paid for services, and for the use of improvements, and providing for "prorating" the expense incident to such interchange. But if the parties cannot themselves agree upon such terms, neither this court nor the commission can make an agreement for them, under the existing law, and under circumstances such as exist in this case.

23. SAME—DISCRIMINATION.

The provision in the third section of the act, to the effect that a common carrier shall not be required "to give the use of its tracks and terminal facilities to another carrier engaged in like business," is a limitation upon, or qualification of, the duty of affording all reasonable, proper, and equal facilities for the interchange, or for the receiving, forwarding, and delivering, of traffic to, from, and between connecting lines; and therefore it is left open to any common carrier to contract, or enter into arrangements for the use of its tracks and terminal facilities, with one or more connecting lines, without subjecting itself to the charge of giving an undue or unreasonable preference or advantage to such lines, or of discriminating against other carriers who are not parties to, or included in, such arrangements. No common carrier can therefore justly complain of another that it is not allowed the use of that other's tracks and terminal facilities upon the same or like terms and conditions which, under private contract or agreement, are conceded to other lines.

24. SAME—TRANSPORTATION OF INTERSTATE TRAFFIC—RATES.

The first section of the act provides that all charges for services rendered by common carriers subject to the provisions of the law "shall be reasonable and just," and prohibits and declares unlawful "any unjust and unreasonable charge." This is the sole requirement of the law upon the subject of rates which common carriers, subject to the provisions of the law, may demand for the transportation of interstate traffic.

25. SAME—THROUGH ROUTES AND RATES.

Arrangements in respect to through freight traffic and joint through rates or charges, as well as the forms of bills of lading, and the apportionment to be made of such joint traffic rates, and of losses or damage to freight in course of transit, are all matters of private arrangement. Such arrangements, which usually include the reciprocal interchange of cars, and the use of each other's tracks and terminal facilities, are prompted by considerations varied and complex. In some instances, and between some companies, they may be mutually desirable and beneficial, while in other cases, and with other connecting lines, they might be prejudicial and injurious to the interest of one or both; and companies in the latter situation cannot properly claim, as matter of right, what the former have acquired under and by virtue of private contract or arrangement.

26. SAME—TRAFFIC ARRANGEMENT—COMMON LAW.

At common law, the refusal of a common carrier to make through traffic arrangements at or upon joint through rates, with one connecting railroad company, such as it makes or enters into with another connecting line, does not constitute any undue or unreasonable discrimination in charges or facilities.

27. SAME—ACT OF 1866.

Section 5258, Rev. St. U. S., (embracing act June 15, 1866,) imposes no duty; it merely permits or authorizes the carriage of traffic from one state to another, and, to that end, the formation of continuous lines by mutual agreement. It confers no power to compel a railroad company to make through routes and through rates with one connecting line because it has, by agreement, made them with another.

28. SAME.

It is clear that from the provisions of section 6 of the act two or more common carriers may lawfully enter into contracts or agreements for the establishment of through routes at or upon joint through rates; because copies of such contracts and agreements, and of the joint tariffs of such carriers, are required to be filed with the commission. If, in the exercise of the right thus impliedly, if not expressly, recognized, a common carrier, by private arrangements, forms a through route, and establishes joint through rates, with certain connecting lines, it cannot be compelled to concede to all other connecting railroads the same or equal through rates, on traffic which the latter may offer for transportation.

29. SAME.

The act does not undertake to create between connecting lines such an agency or *quasi* partnership relation as is necessarily involved in agreements or arrangements for the establishment of through routes and the making of through rates. As such arrangements exist by contract, express or implied, the fact that a common carrier enters into them with one or more connecting lines does not impose upon such carrier the duty or obligation to make the same or like contracts with all other lines.

30. SAME.

No authority is conferred upon common carriers of interstate commerce to issue through tickets to passengers. or through bills of lading for property. at through rates, over connecting lines, in the absence of such arrangements between the companies.

31. SAME—ENGLISH ACTS.

The commission is not invested with authority to establish through routes, nor to fix through rates, between connecting lines. The English act of 1873, amendatory of the act of 1854, did confer such authority upon the English commission; but our act to regulate commerce contains no such provision, and confers no such authority.

32. SAME—RIGHTS OF CONSIGNORS TO ROUTE SHIPMENTS.

An individual shipper or consignor cannot legally require a railroad company to send a shipment, by a particular route, beyond the company's line, at the same or equivalent through rates which such company may have established with other connecting lines; and what the individual shipper of interstate commerce may not lawfully demand, common carriers engaged in transporting such commerce may not lawfully require, of connecting lines.

33. SAME—THROUGH AND LOCAL TRAFFIC—DISCRIMINATION.

In the absence of through traffic arrangements between two railroad companies, the one has the right to treat freights tendered to it by the other as local business, and to charge for the transportation thereof its local rates to destination; and in doing so no discrimination is made against the other company on the traffic it carries; nor does the company charging local rates on such freights make or give any undue or unreasonable preference to other lines, or to the traffic they handle, with whom it has agreements for through routeing, and at through joint rates, which may be lower than its local rates to the same points; because the service in the two cases is not the same, or identical.

34. SAME—OBLIGATION OF CONTRACTS.

Neither the act to regulate commerce, nor the act of June 15, 1866, (Rev. St. U. S. § 5258,) was ever intended to invade the domain of private contracts between common carriers, which were valid when made, and are not in conflict with the provisions of the law. The observance of good faith between parties, the upholding of private contracts, and enforcing their obligations, are matters of higher moment and importance to the public welfare, and far more reaching in their consequences, than the public policy sought to be established in the facilitation of commercial intercourse among the states, which the act of June 15, 1866, aimed to promote.

**35. SAME—CONSTRUCTION OF ACT.**

The law should be as liberally construed in favor of commerce among the states as its language will permit; but when complaint is made, or relief is sought, solely or mainly in the interest of the common carriers engaged in the transportation of such commerce, the act complained of, or the right asserted, should not rest upon any doubtful construction, but should clearly appear to have been forbidden or conferred. And where the complaining carriers are not in a position to commend themselves to the favorable consideration of a court of equity, no strained construction of the law should be made, in order to afford them, or either of them, the relief they seek at the hands of the court.

**36. SAME.**

Under the terms and operations of a contract made by a bridge company and three railroad companies, the railroad companies secured and enjoyed all reasonable, proper, and equal facilities for the interchange of cars and traffic between them, which interchange was conducted for many years at the regular, established yard or depot of one of them, and the expenses of such interchange were shared by them in certain proportions, fixed by contract. After the passage of the act to regulate commerce, one of the railroad companies voluntarily abandoned those facilities, and changed its business to another bridge,—not in the interest of the public, nor of the interstate commerce it handled, but for its own private benefit and advantage,—and then sought to compel the company (at whose yard the interchange of traffic had been conducted) to allow such interchange at a new point of connection, and to afford at such point facilities equal to those which the applicant had voluntarily abandoned. *Held,* that the application ought not to be granted.

**37. SAME—POWERS OF CONGRESS.**

Possessing such sovereign and exclusive power over the subject of commerce among the states, it is difficult to understand why congress may not legislate in respect thereto, to the same extent, both as to rates and all other matters of regulation, as the states may do in respect to purely local or internal commerce; but the court is not called upon in the present case to say what would or would not come within this regulating power, for the existing law does not undertake to prescribe anything more upon the subject of rates than that they shall be reasonable and just; and it does not undertake to require a common carrier, subject to its provisions, to establish through routes and through rates with all connecting lines, merely because it may have done so with one of them.

In Equity. Proceedings to enforce order of interstate commerce commission.

*Ramsey, Maxwell & Ramsey, Bullitt & Shield,* and *E. F. Trabue,* for petitioner.

*Lyttleton Cooke* and *Ed. Baxter,* for respondent.

Before JACKSON and BARR, JJ.

JACKSON, J. On February 10, 1888, the Kentucky & Indiana Bridge Company, a corporation created by the laws of Kentucky and Indiana, owning and operating a bridge across the Ohio river between Louisville and New Albany, and claiming to be a common carrier of interstate commerce, filed its petition before the interstate commerce commission, against the Louisville & Nashville Railroad Company, alleging as the ground of its complaint that said railroad company, in violation of the provisions of the act to regulate commerce, approved February 4, 1887, and in combination and conspiracy with the Louisville Bridge Company, a corporation owning and operating the only other bridge across the Ohio river at Louisville, and with other railroad companies interested in and using said last-named bridge, for the purpose of preventing or obstructing the transfer of traffic and freight over petitioner's bridge, had

refused, and was still refusing, to interchange traffic with, or to receive from petitioner or the railroad companies using its bridge, cars or freight tendered said Louisville & Nashville Railroad Company, for transportation over its line or lines southward, or to deliver to petitioner, or any railroad company using its tracks and bridge, freights arriving by the Louisville & Nashville Railroad at Louisville, for or consigned to points on petitioner's said railway, or to any railroad connecting therewith at New Albany, although said Louisville & Nashville Railroad Company afforded such facilities for the interchange of traffic to said Louisville Bridge Company, and to the railroads north of the Ohio river using that bridge. The point of connection between petitioner's track and that of the Louisville & Nashville Railroad, at which said interchange of traffic was demanded and refused, was at Seventh street and Magnolia avenue, in the city of Louisville. The prayer of the petition was "that the defendant, (the Louisville & Nashville Railroad Company,) be required, by the order of the commission, to interchange traffic with the petitioner and with the railway companies using its railroad at said point of connection at Seventh street and Magnolia avenue, and to receive from petitioner and said railway companies using its railroad all freight tendered by it or them to said defendant for transportation to points on or beyond, and by way of its railroad or railroads, and to deliver to petitioner and to the railroad companies using petitioner's railroad, at said point of connection, all freights arriving at Louisville over defendant's railroad, and consigned to petitioner or to railroad companies using petitioner's railroad, or to points on the line of petitioner's railroad, or the railroads using its track."

In its answer to said petition the defendant did not concede that the petitioner was a common carrier of interstate commerce. It admitted the physical connection of its own and the petitioner's tracks at Seventh street and Magnolia avenue, which connection, under its charter, it could not prevent; but denied that such connection imposed upon it, either by the state or federal law, the duty of making a business connection, for the interchange of traffic at that point. It denied that said connection was a suitable and convenient place for the interchange of cars or freight with the petitioner or railroads using its tracks and bridge, for the reason that neither itself nor the petitioner had any depot, platforms, buildings, or other suitable facilities there for the interchange of traffic, and because defendant had no clerks, agents, car inspectors, repairers, or other employes at that point, to attend to the business of such interchanges. It further denied that such interchange at said point could be made without the use of its tracks and terminal facilities by the petitioner. It further claimed that the requirement to interchange traffic at said point of connection would be unreasonable and improper, because the defendant already had in the city of Louisville four regular yards and depots, with ample facilities and accommodations for the handling and interchange of traffic arriving at or going from said city. That its main yard and depot for the reception and delivery of freight was at Ninth street and Broadway, in the city of Louisville, where it interchanged traffic with the Louisville Bridge Company, and the railroads north of the Ohio river

using that bridge, and where it had ample accommodations and an adequate force of clerks, agents, and employes to transact the business, and to make all exchanges of traffic. The defendant further set up the fact that, in 1872, it had entered into a written contract with said Louisville Bridge Company, and with the Jeffersonville, Madison & Indianapolis Railroad Company, and the Ohio & Mississippi Railway Company, under and by virtue of which it had agreed to interchange freights and traffic with said railroad companies, and any other company using said bridge, upon certain terms, more favorable to itself, than the Kentucky & Indiana Bridge Company had or could offer, and which contract (hereafter fully set out) defendant felt was still obligatory and binding upon it. For these and other reasons set forth in its answer the Louisville & Nashville Railroad Company claimed that it was not discriminating against petitioner, and was justified in not acceding to its demand for an interchange of traffic at the Seventh street and Magnolia avenue connection, as such interchange with petitioner at that point would entail upon it extra expense, inconvenience, and trouble, and compel it to violate its contract and obligations with the Louisville Bridge Company.

On the issues thus made, testimony, oral and written, was presented, and arguments were heard before the interstate commerce commission, which, on August 2, 1888, rendered its decision in the premises as follows:

"This case having been heretofore submitted on the evidence, and on written and printed briefs, and having been maturely considered, and the commission now finding that complainant is a common carrier; and that, as such, defendant is bound and obliged by law to give to it equal facilities for the interchange of traffic to those it affords to other common carriers; that defendant cannot lawfully refuse to receive traffic which is brought to it over the the bridge of the complainant, on the ground that the railroad company bringing it had contracted with defendant to bring all its traffic across the Ohio river at this point on the Louisville bridge; and that the point of connection of complainant's line with defendant's road in the city of Louisville is a suitable point at which defendant should receive traffic for and from complainant: It is now ordered that the complaint be, and the same is hereby, sustained, and that defendant cease from refusing to receive from complainant and the carriers using its track the traffic brought and offered to it at the point of connection aforesaid. It is further ordered that defendant allow and afford to complainant, as a common carrier, at that point, the same equal facilities which it affords to other common carriers at the points of connection with their lines, respectively. And it is further ordered that a notice embodying this order be forthwith sent to the defendant corporation, together with a copy of the report and opinion of the commission herein, in conformity with the provisions of the fifteenth section of the act to regulate commerce."

Notice, embodying the order of the commission, together with a copy of its report and opinion in the premises, was promptly sent to and received by the Louisville & Nashville Railroad Company; and thereafter, on the 12th day of September, 1888, the Kentucky & Indiana Bridge Company tendered to the Louisville & Nashville Railroad Company, at said point of connection, (Seventh street and Magnolia avenue in the city of Louisville,) a Cincinnati, Hamilton & Dayton car, No. 13,082, from Cincinnati, Ohio, via the Ohio & Mississippi Railway, loaded with ma-

chinery, consigned to Columbia, Tenn., a point on the Nashville & De-
catur Division of the Louisville & Nashville Railroad, which the latter
declined to receive. The general freight agent of the Kentucky & In-
diana Bridge Company, in making tender of this car, addressed to T. J.
Kean, the agent of the Louisville & Nashville Railroad Company, under
date of September 12, 1888, the following note:

"DEAR SIR: Cincinnati, Hamilton & Dayton car 13,082, from Cincinnati,
via Ohio & Mississippi Railroad and the Kentucky & Indiana Bridge Com-
pany, containing machinery for Columbia, Tenn., is now standing on track
connecting Louisville & Nashville Railroad and the Kentucky & Indiana
Bridge Company's belt line, at Seventh street and Magnolia avenue, and con-
venient for your engine to get hold of it. The regular billing for this car has
been sent to your office by the Ohio & Mississippi people, in the usual manner.
Please say if you will accept and forward this freight."

The billing referred to in said letter, which was sent by the Ohio &
Mississippi Railway to the Louisville & Nashville Railroad, was in the
following form:

"(FORM 1829.)

"L. & N.—LOUISVILLE, Sept. 12, 1888.

"M. Harry Smythe, Columbia, Tenn.:

"No. 1442.                To OHIO & MISSISSIPPI RAILWAY CO., Dr.

"For transportation of merchandise from Cincinnati, 9, 12, 1888, W. B.
Mem. Car 13082, C. H. D.

| Address. | Package. | Description of Property. | Weight. | Rate. | Charges. |
|---|---|---|---|---|---|
| | | Machinery.............. | 6960 | 15 | $10 44 |
| | | O. R., C. H. & D...... | .......... | 12 | 8 35 |
| | | L. & N................ | .......... | 53 | $18 79 |
| | | Through............... | .......... | 80 | |

"Received payment:

"—————.——, Cashier.

"Way-bill, Mem. Car 13082. From Cincinnati, O., 9, 12, 1888.

"No. 1442.—C., H. & D.                LOUISVILLE, 12th, 1888.

"Received of Ohio & Mississippi Railway, the following described property,
in good order except as noted:

| Address. | Description of Property. | |
|---|---|---|
| Harry Smythe, Columbia, Tenn. | Machinery, O. R. | 6960 |

"C., H. & D.
"Charges, $18.79."

The car thus tendered having been declined, the agent of the Louis-
ville & Nashville Railroad Company returned said billing to the agent
of the Kentucky & Indiana Bridge Company, on the same day of the

tender.    Thereupon the Kentucky & Indiana Bridge Company, on 13th September, 1888, filed its bill or petition in this court against the Louisville & Nashville Railroad Company, under the provisions of the sixteenth section of the interstate commerce act, setting out and reciting therein the said proceedings had before the commission, together with its report and order in the same, alleging that the findings of fact by said commission were correct and true, and charging that since the order of the commission in the premises was made, and notice thereof delivered to defendant, complainant had, on its own behalf, and on behalf of other common carriers using its tracks, requested said defendant to make interchange of freight with it and with said carriers, at the point of connection (Seventh street and Magnolia avenue) between petitioner's line and defendant's road in the city of Louisville, and had brought and offered to defendant, at said point of connection, freight in car-loads, coming from points beyond the state of Kentucky, and north of the Ohio river, and destined to points beyond, and south of the south line of the state of Kentucky, and had requested defendant to receive and forward the same, and had further requested defendant to afford petitioner, as a common carrier, and to the common carriers using its tracks, the same facilities for the interchange of freight which defendant afforded to other common carriers in the city of Louisville, with their lines respectively; but that defendant had refused, and was still refusing, to interchange interstate freight of any sort, or under any circumstances, with it, at said point of connection, or elsewhere in the city of Louisville, or to so interchange with any common carrier using its tracks.    That defendant refused, and was still refusing, either to receive or to deliver at said point of connection, or elsewhere in the city of Louisville, any freight whatever from or to petitioner, or any common carrier using its tracks; and in all respects had violated, refused, and neglected, and would continue to violate, refuse, and neglect, to obey, in any respect, the lawful directions and requirements of said commission, as set forth in its said report and order; and would continue its refusal in any manner to interchange freight with, or to afford any facilities whatever to, petitioner, or to said common carriers using its tracks, for such interchange of traffic, or for receiving, forwarding, and delivering passengers and property between the connecting lines of the petitioner and defendant.    Wherefore the petitioner prayed "that by the writ of injunction, or other proper process issuing from this court, the defendant, the Louisville & Nashville Railroad Company, may be restrained from further continuing to violate or disobey said order and requirement of said commission, and may be enjoined to render obedience to the same; and that the defendant may be so enjoined and required to interchange traffic with your petitioner, and with the railway companies using your petitioner's railroad at the said point of connection at Seventh street and Magnolia avenue, in Louisville, Ky., and to receive from your petitioner, and said railroad companies using petitioner's railroad, all freight tendered by it or them to the said defendant for transportation to points on, beyond, and "via" defendant's railroad or railroads, and to deliver to the petitioner, or railroad companies using

petitioner's railroad, at said point of connection, all freight arriving at Louisville on defendant's railroad, and consigned to the petitioner, or to said railroads using petitioner's railroad, or to points on the line of petitioner's railroad, or of railroad companies using petitioner's tracks; and for such other and further relief in the premises as to this honorable court ·may seem just, proper, and equitable." Upon the filing of said petition this court, in conformity with the provisions of the sixteenth section of the interstate commerce act, and to the end that a speedy hearing and determination of the matter in controversy might be had, issued its order, directing defendant to be served with a copy of said petition, and requiring it to make its response or defense thereto on the 3d day of October, 1888, at which time the defendant appeared and filed its answer, which is quite lengthy, and sets up various matters and grounds of defense to the relief sought.

. Respondent, after admitting petitioner's corporate capacity, sets out the acts of Kentucky and Indiana, under and by virtue of which it was organized, and certain provisions of its amended and original charter, showing the extent and character of its corporate powers and franchises, which respondent alleges constitute petitioner nothing more than a bridge company, having no right as a common carrier whatever, and only authorized to demand and receive tolls for the use of its bridge and terminal tracks connected therewith. Respondent denies that petitioner is either *de jure* or *de facto* a common carrier of interstate commerce, and disputes the correctness of the commission's finding of fact or conclusion of law on 'that question. Respondent denies that petitioner, as such carrier, had tendered it any interstate freight or passengers for transportation over respondent's road since the order of the commission. In that connection, and as showing the character in which petitioner handles the freight or traffic which it sought to have interchanged at said point of junction in Louisville, respondent states that petitioner, on September 29, 1886, entered into a written contract with the Ohio & Mississippi Railroad Company, whose road enters Louisville from the north side of the Ohio river, under and by the terms of which the latter was allowed for a period of 20 years, and upon the payment of an annual rental by way of toll, "to run its locomotives, cars, and trains over petitioner's bridge and approaches;" said Ohio & Mississippi Railroad Company agreeing on its part "to carry and transport over the said bridge, approaches, and railway tracks all of its locomotives, cars, freight, passengers, mail, express matter, and everything else carried or transported by it on its own line of railroad, destined or consigned to or from Louisville, and to or from points which require their passage over the Ohio river at or near Louisville;" "the interchange of freight business at Louisville and New Albany between said [Ohio & Mississippi] railway company and any connecting road, shall be done over the tracks of the bridge company, between the south approach to its bridge and the tracks of such connecting road;" and that, by the fourth clause of said contract, petitioner agreed to transfer cars from the Ohio & Mississippi Railway Company's transfer-yard south of Bank street, in Louisville, to respondent's railroad, or the Ches-

apeake, Ohio & Southwestern Railroad, at a switching charge of one dollar per car.

Respondent further states that on June 21, 1887, the petitioner made and entered into a written contract with the Louisville Southern Railroad Company, whose road enters Louisville from the south, by the terms of which petitioner had leased to said railroad company for the period of 99 years the equal right to possess and own, in common with petitioner, for railroad purposes, the railroad right of way, road-bed, main and side tracks, and switches, appurtenances, and fixtures possessed or owned, or hereafter possessed or owned, by petitioner, on the south side of the Ohio river, between Magnolia avenue and the yard of said Louisville Southern Railroad Company in Louisville; that by said contract it was further agreed that petitioner and said railroad company should construct a line of track, with the necessary switches and sidings, eastwardly along Magnolia avenue, to a connection with the track of respondent, at or near the intersection of said Magnolia avenue and Seventh street, said connection to be constructed and maintained at the joint expense of petitioner and said Louisville Southern Railroad Company, and to be operated by the latter in the manner stipulated; that by the eighth clause of said contract the Louisville Southern Railroad Company agreed to provide and keep a sufficient number of suitable switching-engines on hand, and to handle promptly all freight cars to be moved between petitioner's transfer tracks in Louisville and the railroads of respondent and the Chesapeake, Ohio & Southwestern, at a charge or switching rate to be fixed by the parties to said contract, which charge, or the gross revenue thus obtained, was to be divided between petitioner and the said railroad company in the proportion of 55 per cent. to the latter and 45 per cent. to the former, except as to the switching charges on cars of the Ohio & Mississippi Railway Company, which petitioner had, by its contract of September 29, 1886, agreed to transfer at one dollar per car. The Louisville Southern Railroad Company was to make no charge for switching such cars of the Ohio & Mississippi Railway Company, but the switching charge of one dollar for transferring the cars of that company was to be paid wholly to petitioner.

Under the operation of said contracts with the Ohio & Mississippi and the Louisville Southern Railroad Companies, respondent insists that petitioner had nothing to do with the carriage or transportation of any interstate freights coming from or destined to said Ohio & Mississippi Railway Company, except the duty of transferring the cars of said railway company between certain points south of the Ohio river, for an agreed switching charge of one dollar per car; and that by its contract with the Louisville Southern Railroad Company petitioner had assigned and transferred to the former the right to do all the switching business passing over petitioner's tracks; so that, as the result of the two contracts, petitioner had nothing at all to do with interstate freight carried either by the Ohio & Mississippi Railway Company or the Louisville Southern Railroad Company; and in respect to said freights was neither *de jure* nor *de facto* a common carrier.

Respondent further states that petitioner owned no freight cars; that it had five engines and ten passenger cars, and assumed to transfer passengers between the cities of Louisville and New Albany, but had never tendered respondent any passengers for transportation; that petitioner also assumed to carry freight, locally, between said cities, but has tendered none of such freight to respondent for transportation on its road. Respondent also states that petitioner has on several occasions procured freight cars from railroad companies, and, having loaded them on some one of the five side tracks in Louisville connected with petitioner's track, assumed to issue bills of lading therefor to points beyond Louisville or New Albany; but in all such cases the freight charges are paid to the railway companies from whom the cars were ordered or procured, and that petitioner's only charges in the matter were for bridge-tolls, and for its terminal services in switching the loaded car; said bridge-tolls varying from one and one-fourth to six cents per hundred pounds, according to classification of freight, and the switching charges varying from one dollar to three dollars per car.

Respondent admits that it is a common carrier of interstate freight and passengers, between points situated upon its railroad, but denies that it is a common carrier of such interstate traffic to or from points beyond its own railroad, or that it holds itself out to the public as a common carrier, undertaking to transport beyond its own lines. Respondent avers that it has at all times refused to engage in the transportation of either freight or passengers to or from points beyond its own lines, except where certain agreements or arrangements had been made between itself and the other railroad companies, whose roads were part of the through routes, under which agreements or arrangements certain through rates were established, and the proportions of these rates to be received by the different companies whose roads formed the through routes were agreed upon; also the proportion in which losses resulting from such through business should be borne by said companies; also the terms and conditions to be inserted in the through tickets and bills of lading; but that respondent had never entered into any such agreement or arrangement with petitioner, and was unwilling to do so, or to act under through tickets or through bills of lading, which petitioner might see proper to issue, in the absence of such agreement fixing and defining the terms and conditions of through traffic received from, or to be delivered to, petitioner. Respondent admits the proceedings had before, and the report and order made thereon by, the commerce commission, as alleged in the petition; admits that since said commission's order was made, and said notice thereof was delivered to respondent, petitioner had, on its own behalf, and, perhaps, assuming to act on behalf of the Ohio & Mississippi Railway Company, requested the respondent to make interchange of freight with it, and with carriers using its track, at the point of connection between petitioner's track and respondent's track, at Seventh street and Magnolia avenue in the city of Louisville; that petitioner had requested respondent to afford it and the common carriers using its track the same facilities for the interchange of traffic at said point of connec-

tion which respondent affords to other common carriers in the city of Louisville, at other points where their connections are made, and that respondent had refused, and was still refusing, to interchange interstate freight of any sort, or under any circumstances, with petitioner, or with any common carrier using its track, at petitioner's said point of connection. Respondent states that to accommodate certain local shippers at Louisville, whose establishments are located upon side tracks connected with the track of petitioner in Louisville, it has been, and is still, willing, without being legally bound to do so, to accept, at said point of connection, car-load freights destined to points south of Louisville, on or reached by respondent's railroad system, and to transport the same at Louisville rates proper, provided such car-load freights originate at or on local Louisville sidings, except a certain siding claimed to be owned by the Kentucky & Indiana Stock-Yard Company; that since the order of said commission the petitioner had not brought or offered to respondent, at said Seventh street and Magnolia avenue connection, any freight, in car-load lots, coming from points beyond the state of Kentucky, and north of the Ohio river, and destined to points beyond and south of the south line of the state of Kentucky, or any other interstate freight which it had requested respondent to receive and forward, except in one instance, viz., the car containing machinery, as above described, tendered on September 12, 1888, which respondent declined to receive; and respondent insists that in declining to receive said car, and in refusing to interchange traffic with petitioner at said point of connection, it has not violated any lawful order or requirement of said commission. Respondent claims that the order of said commission in petitioner's favor is not lawful, and it is not therefore bound to obey the same. Respondent denies the truth and correctness of said commission's findings of fact in several material particulars. It denies that petitioner is either *de jure* or *de facto* a common carrier of interstate commerce, as found and reported by the commission. It denies that petitioner, as such carrier, has tendered respondent any interstate freight or passengers, for transportation over its road, since the order of the commission. It denies that petitioner, even as a *de facto* common carrier, is now, or was at the time of instituting said proceedings before the commission, engaged in interstate traffic between points south or east of Louisville, or north of New Albany, and avers that the Ohio & Mississippi Railway Company was the only common carrier engaged in said interstate traffic handled or switched over petitioner's track.

In this connection respondent says "that wherever petitioner has undertaken to load cars upon its sidings, either in New Albany or Louisville, for points in other states, it has procured the cars from railroad companies owning the lines for which said freight was destined; and the charges for the transportation of such freight were and are paid to said railroad company or companies furnishing the cars, the said bridge company (petitioner) rendering no service, and making no charge, in regard to said cars (or freight) except charges for switching them," and receiving its regular bridge-toll, if the cars passed over its bridge. Respondent denies that petitioner's connection with its track at Seventh street and Magnolia avenue, in Louisville, is a proper, suitable, and conven-

ient point for the interchange of traffic between respondent and petitioner, or with common carriers using the latter's tracks, as found by the commission. Respondent states that there are no buildings at that point for clerks, porters, and other employes, needed and required in carrying on an interchange of traffic there; that such interchange at that connection would entail extra expense and trouble upon respondent, would involve the use of its terminal facilities, as all cars interchanged at that point would have to be hauled from there, over respondent's main track, to its yard and freight depot at Ninth and Broadway, in Louisville, and if all the common carriers who might choose to use petitioner's tracks were to have an interchange of traffic at that point it would be very inconvenient and unsuitable, etc. Respondent denies the correctness of the commission's finding that it refuses to afford petitioner, or common carriers using its bridge, all proper, reasonable, and equal facilities for the interchange of traffic such as respondent furnishes to other carriers of interstate commerce at the city of Louisville, and states that "respondent is and has always been willing to receive from and deliver to petitioner, at respondent's regular freight depot at Ninth and Broadway streets, in Louisville, any freight that may be consigned to or by petitioner, upon being paid therefor Louisville rates proper;" and further says that "the facilities afforded by respondent at said depot are reasonable and proper in themselves, and are equal to the facilities which respondent affords to all other Louisville consignees or consignors; and as petitioner and respondent have made no agreements or arrangements for doing through business of any kind, petitioner is a mere local Louisville customer, so far as respondent is concerned, and is therefore entitled to no other facilities than those which respondent furnishes to all of its other Louisville customers." Respondent further shows that it has three freight-yards in the city of Louisville, and a fourth near thereto, which are fully adequate for the transaction of all its business, both freight and passenger; that its main or principal yard and depot is located at Ninth and Broadway, where the traffic crossing the Ohio river at Louisville is interchanged with the various railroads leading north from Louisville, and where local freight brought from the south, destined to Louisville, or received at Louisville destined to points south, is handled. Respondent says such is the capacity and commodious character of this yard and depot that six trains, of eighteen cars each, making an aggregate of one hundred and eight cars, standing upon six tracks, can be loaded and unloaded at the same time under shelter, and that respondent keeps at that point a large force of clerks, inspectors, porters, etc., for the transaction of its freight business. Respondent claims that, having under its charter obligations established four ample and adequate yards and depots at Louisville for the transaction of its business, and where its interchanges with other carriers are made, and both through and local freights are received and delivered, it cannot be required to establish or furnish other and additional facilities at Seventh and Magnolia avenue, for the convenience or accommodation of petitioner or the carriers using its tracks. Respondent states that the lines of railroad owned, leased, controlled, and operated by it extend from Cincinnati to Louisville, Nashville, Chattanooga, Decatur, Montgomery, Mo-

bile, New Orleans, and other southern points; that from Louisville to Cincinnati its road, located on the south side of the Ohio river, forms a competing line with the Ohio & Mississippi Railway, extending from Louisville to Cincinnati, on the north side of said river; that going south, or to Chattanooga and points south of there, its road is in active competition with the Cincinnati Southern and the Louisville Southern Railroads; that prior to 1872 freight and passengers crossing the Ohio river at Louisville had to be transferred through the city, and ferried across the river, which occasioned serious delays and extra expense to traffic and travel, to remedy which the Louisville Bridge Company was incorporated in 1856, by the legislature of Kentucky, for the purpose of constructing a railroad bridge across the Ohio river at or near the city of Louisville; that the charter of said Louisville Bridge Company was so amended in 1862 as to authorize it to contract with any incorporated railroad company, "to warrant the annual profits of the bridge to be built by said company shall be equal to keeping the bridge in repair, and of its operation, and that the net earnings shall be equal to six per cent. on a cost of $1,000,000."

Said bridge company was further authorized to contract, at an agreed sum or rate, with any railroad company, for the annual use of said bridge by the cars or for the purpose of said railroad company; and it was made lawful for any railroad company incorporated by the laws of Kentucky to subscribe to the stock of said bridge company, and to make the guaranties and agreement as to the earnings of the bridge, authorized by the act. That by an act of congress approved February 17, 1865, (amending an act approved July 14, 1862, declaring the bridge across the Ohio river at Steubenville to be a lawful structure,) the Louisville & Nashville Railroad Company and the Jeffersonville, Madison & Indianapolis Railroad Company were authorized to construct a railroad bridge over the Ohio river at the head of the falls of the Ohio, subject to all the provisions of said act of July 14, 1862; and the bridge so to be constructed was declared "to be a lawful structure." That under this legislation, state and federal, the capital stock of the Louisville Bridge Company was subscribed for by various parties, individuals, and corporations, including the Jeffersonville, Madison & Indianapolis and the Louisville & Nashville Railroad Companies,—the subscription of the latter being for $300,000,—and the bridge was constructed; and that thereafter, upon its completion, on June 5, 1872, a written contract was entered into between said Louisville Bridge Company as party of the first part, the Jeffersonville, Madison & Indianapolis Railroad Company of the second part, the Ohio & Mississippi Railway Company of the third part, and the Louisville & Nashville Railroad Company of the fourth part, stipulating, among other things, as follows:

"*First.* That the second, third, and fourth parties agree, respectively, to use said bridge. *Second.* The first party 'agrees that the tolls and charges over and for the use of said bridge and its tracks, in the transportation of freight, passengers, mails, and other goods received from or delivered to the roads of second, third, and fourth parties, per ton, or per passenger, or per car, en-

gine, or other means of transfer, over said bridge, shall be fixed on signing this agreement, and shall not be in excess of a toll or charge sufficient to produce in the aggregate a sum equal to the cost and expense of keeping in repair and taking care of said bridge; paying a dividend of six per cent. upon its capital stock of $1,500,000; the interest upon said bonds (of the bridge company) as the same matures; a sinking fund, sufficient to pay off said bonds of $800,000 at maturity; the amount necessary to keep up the corporate organization of the first party; and such taxes as may be chargeable against such bridge company on said bridge or other property pertaining thereto, or otherwise.' *Third.* That said charges and tolls shall, from year to year, be reduced in proportion to the reduction of interest on said bonds, by the operation of the sinking fund. *Fourth.* That the tolls and charges shall always be the same to each of the second, third, and fourth parties. *Fifth.* That the tolls and charges to other railroads or railroad companies, for like use of said bridge and the approach owned by the first party, shall not be less than those charged to or incurred by the parties hereto. *Sixth.* That all such tolls and charges paid by other railroads shall be applied to, and form a part of, the fund hereinbefore provided for the payment of expenses, sinking fund, interest, dividend, and taxes, the same as if paid by the second, third, and fourth parties. *Seventh.* That in the event the bridge should by any casualty be injured so as to render it useless or dangerous, and it should become necessary to rebuild the whole, or any material part thereof, involving an expenditure greater than could be realized from a judicious amount of guarantied rates and charges, ' then an additional number of bonds were to be issued, to yield a fund sufficient to renew and repair the bridge; and in that event the tolls and charges were to be increased, so as to provide for the payment of such additional bonds, and to provide a sinking fund, to retire them at maturity.' *Eighth.* The second and third parties (the Jeffersonville, Madison & Indianapolis, and Ohio & Mississippi Railway Companies) each severally agreed ' that it will pass over the said bridge all the freight, passengers, mails, express matter, and other goods carried on and over their railroads to and from Louisville, and to and from points which require their passage over the Ohio river at or near Louisville, during the existence of this agreement,' and will pay punctually to the first party the tolls and charges stipulated for the use of said bridge and approaches thereto owned by the bridge company. *Ninth.* The party of the fourth part (the Louisville & Nashville Railroad Company) ' covenants with each of the parties of the first, second, and third parts, their respective successors and assigns, that it will deliver to said party of the first part to be passed over the said bridge, or to the parties of the second or third parts, or to such other railroad company or companies as may, for the time being, be transporting freight, passengers, mails, express matter, and other goods over said bridge, all the freight, passenger, mail, and express matter, and other goods carried on and over its road, or any part thereof, destined for Jeffersonville, in the state of Indiana, or any other points which require their passage over the Ohio river at or near Louisville, during the existence of this agreement, and will charge on said traffic, in addition to its rates for transportation service, the then established rate of tolls and charges hereinbefore provided for the use of said bridge and approaches, and punctually pay the said tolls and charges to the first party.' *Tenth.* The north approach to said bridge, being owned by the second party, (the Jeffersonville, Madison & Indianapolis Railway Company,) and the line of the third party, entering Jeffersonville, being connected therewith, it was agreed between said parties that the third party would use said approach to and from said bridge in going on and over the same, and that all the trains, cars, and engines passing over said approach and bridge ' shall be under the control and direction of the second party, and that whatever rules are prescribed for the government of the trains,

cars, and engines of the second party in the premises shall be equally applicable to the trains, cars, and engines of the third party, each being dealt with alike, and the second party covenants to furnish all needful and sufficient engines for the service mentioned, and at all times to transfer, with the same promptness and care, over the said bridge, the trains, cars, engines, and traffic of the third and fourth parties that it does the trains, cars, engines, and traffic received from or to be delivered to its own road,—the intention being that each of the parties shall enjoy equal facilities over said approach and bridge.' *Eleventh.* That 'for the service aforesaid of said engines of the second party, and the conducting and management of the same, and of cars, trains, and business over said approach and bridge, the second party shall be allowed a reasonable compensation, to be apportioned between the parties hereto in proportion to the services to each, per ton, and per passenger, or per engine, or other means of transportation, as the parties may hereafter agree.' *Twelfth.* That 'if any difference shall arise between the parties, or any of them, as to the construction of any of the provisions of this contract, or the mode of performance, the same shall be submitted to arbitration; the qualification of arbitrators, and an umpire, and the obligation to perform the award by them made, to be the same as hereinbefore provided.' *Thirteenth.* That 'this contract shall continue in force and operation until it shall be terminated by some one of the partes thereto, giving notice in writing to the other parties, of its intention to terminate the same at the expiration of two years from the giving of such notice; at the expiration of which two years the same shall terminate as to all parties hereto included in such notice.'"

Respondent further states that since said contract was entered into, the Louisville, New Albany & Chicago Railway Company and the Louisville, Evansville & St. Louis Railroad Company have been allowed to use said bridge and its approaches in substantial accordance with the provisions of said contract; that the rates of tolls and charges upon said bridge have been continually growing less per ton and per passenger, as the volume of traffic over the bridge has increased; that the dividends agreed to be paid upon the capital stock of said bridge company were, seven or eight years since, reduced from 6 to 4 per cent. semi-annually, and that the sinking fund is now sufficient to pay off the mortgage bonds of the bridge company, which mature in December, 1888; that since the construction of said bridge, and under the operation of said contract, the practice has been for the roads coming into Louisville from the north to have their freight cars switched by the Jeffersonville, Madison & Indianapolis Railroad engines across the said Louisville bridge, to the transfer-yards of respondent at Ninth and Broadway, where all cars loaded for one point in the south were put into trains, and forwarded to destination; and whenever a car contained freight destined to two or more points in the south, the freight was unloaded, assorted, and reloaded into cars destined to those points; that a similar practice or mode of conducting the traffic prevailed as to all freight coming over the respondent's road from the south, destined to points north of the Ohio river, and crossing the river at Louisville; and further, that said Louisville bridge has been and is fully adequate to transfer all traffic crossing the Ohio river at Louisville, and to do it as promptly and cheaply as it can possibly be done by any other bridge. Respondent then states that the Ohio & Mississippi Railway Company continued to use said Louisville bridge

under the terms of said contract of June 5, 1872, and to interchange traffic, under arrangements therefor with respondent, at respondent's yard and freight depot, at Ninth and Broadway, in Louisville, until February 4, 1888, when said Ohio & Mississippi Railway Company gave notice of its intention to withdraw from said contract at 12 o'clock noon of that day. Respondent says it is perfectly willing to continue to interchange traffic with said Ohio & Mississippi Railway Company, and with all other railroads reaching Louisville from the north, if they will use said Louisville bridge, and will continue to make the interchange at respondent's yard at Ninth and Broadway, which has been prepared at great expense, and where all necessary and adequate facilities are at hand; that to allow said Ohio & Mississippi Railway Company to divert its traffic from said bridge will reduce the annual revenue thereof about one-fifth, or not less than $129,167.17 per annum, and the loss of that revenue will compel a corresponding increase in the tolls to be paid by respondent upon the traffic which it is bound to send across said bridge, causing an annual loss and injury to respondent of several thousand dollars. Respondent says that petitioner, having built a new bridge across the Ohio river, has induced the Ohio & Mississippi Railway Company to abandon the Louisville bridge and to use petitioner's bridge, and now seeks to compel respondent to interchange traffic with the said Ohio & Mississippi Railway Company, at the intersection of petitioner's track with respondent's road, at Seventh street and Magnolia Avenue, where there are no facilities for such interchange, and from which point all cars interchanged would have to be hauled over respondent's track, to its yard and freight depot at Ninth and Broadway, thus necessitating the use by petitioner of respondent's terminal facilities at Louisville. Respondent says that it cannot at said point of connection return or deliver cars to petitioner without using the latter's tracks to a greater or less extent, and that by the terms of the ordinance of the city of Louisville, granting petitioner the right to lay its tracks in said city, it is provided that before entering upon the use of petitioner's tracks respondent or any other railroad company shall pay to petitioner a *pro rata* share of the cost of constructing such tracks, and shall bind itself, by contracts with the city of Louisville, that respondent or such other railroad company will contribute its *pro rata* share towards the repair and maintenance of any additional tracks, and of any gates, approaches, culverts, bridges, trestles, or fills that may be necessary to the safe and efficient use of said tracks, and towards the maintaining of such watchmen as may be necessary to the proper guarding of street crossings, etc.; that respondent, having a sufficient number of tracks of its own for the transaction of all its business at and in said city, has no desire to use petitioner's tracks, and is unwilling to incur the hazard of litigation with the city of Louisville by even such use of petitioner's tracks as would be necessary in returning cars to it.

Respondent insists that the order of the interstate commerce commission in favor of petitioner and against respondent is not a lawful order or requirement, for the following reasons, viz.: *First.* Because petitioner

is neither *de jure* nor *de facto* a common carrier of interstate commerce. *Second.* Because respondent is required to interchange traffic with common carriers using petitioner's track at said point of connection at Seventh street and Magnolia avenue, when no such carriers were parties to the proceedings in which the order was made.    *Third.* Because at said point of connection there are no buildings, sheds, or conveniences for the interchange of freights, and no clerks, inspectors, or other employes to attend to such interchange; while all such facilities, to an ample and sufficient extent, are provided at respondent's Ninth and Broadway yard and depot, where it interchanges with all other railroads coming into Louisville from the north side of the Ohio river.    *Fourth.* Because under said order respondent is required to receive and deliver, at said point of connection, freight from and to any carrier using petitioner's track, although such carrier may have contracted with respondent to bring its traffic over the Louisville bridge, and to interchange it with respondent at its regular yard; that it will compel respondent to interchange at said connection freights which the Ohio & Mississippi Railway Company may bring across the Ohio river over petitioner's bridge, in violation of its contract with respondent and others, and, in effect, impair the obligation of that contract.    Respondent submits that it cannot be lawfully required to release the Ohio & Mississippi Railway Company from the obligation imposed by said contract.    *Fifth.* Because the effect of said order is to compel respondent indirectly to furnish to the public petitioner's bridge as an additional facility for the interchange of traffic crossing the river, after respondent had contributed as a stockholder in building the Louisville bridge, and secured the use of that bridge as a terminal facility at Louisville for the transfer of traffic across the Ohio river.    *Sixth.* Because the effect of said order is to force respondent to enter into contracts with petitioner, and with carriers using its tracks, for the through transportation of interstate traffic to and from points beyond respondent's lines of railroad, simply because respondent has seen proper to make such contracts with other common carriers.    *Seventh.* Because the effect of said order will be, not only to require respondent to receive from petitioner and all common carriers using its tracks, interstate traffic, but also to transport it at the same *pro rata* of through rates that respondent may have agreed to with other carriers; the result of which, as respondent insists, will be indirectly to establish the rates which respondent is to charge on interstate through traffic tendered it by petitioner, or by carriers using petitioner's tracks; and this respondent denies the authority of the commission, or of congress, to do.    *Lastly.* Respondent submits that congress cannot require or authorize this court to execute or enforce any order that said commission may assume to make; and if the petition in this case is to be regarded as an original proceeding in this court, to enforce the supposed rights of petitioner under the act of congress to regulate commerce, and without regard to the order made by said commission, then respondent insists that the court has no jurisdiction, because the petitioner is a corporation chartered and created by the laws of Kentucky and Indiana, and respondent is a corporation also chartered and created by the laws of Kentucky.

Upon the filing of respondent's answer, all matters of fact raised by the pleadings and necessary to a proper determination of the legal questions involved were by the court referred for investigation and report to a special referee, before whom much proof was taken on both sides, and the facts bearing upon the controversy were gone into more fully than before the commission. On the 29th of October, 1888, the referee submitted his report in the premises, with all the evidence introduced. The respondent filed numerous exceptions to said report, which was presented at the same time with the hearing upon the merits. Many of respondent's said exceptions are, in the judgment of the court, well taken, and should be allowed; but without noticing or acting upon them in detail, which would unnecessarily extend this opinion, the court finds the material facts of the case as disclosed by said report, and such modification thereof and additions thereto as the evidence supporting and sustaining respondent's allowed exceptions to the same warrants, to be as follows: The Louisville & Nashville Railroad Company was incorporated by an act of the state of Kentucky, approved March 5, 1850, with power to construct "a railroad from Louisville to the Tennessee line, in the direction of Nashville;" and for the transportation of persons, merchandise, and property of any kind over or along said railroad was authorized to charge any sum, not exceeding certain specific rates. Its charter, among other things, provided that "it shall not be lawful for any other company, or any other person or persons, to travel upon or over any of the roads of said company, or to transport persons or property thereon, without the license and permission of the president and directors thereof;" but power was reserved to the state of Kentucky to incorporate thereafter other railroad companies, and it was provided (section 18) "that any and all such railroad or railroads hereafter constructed may connect and join with the road hereby contemplated." By an amendment to its charter, made in 1860, said company was authorized to "make arrangements with other companies for through freights and passage from distant points, on such terms as they may agree from time to time." Under proper legislative authority, the lines of the Louisville & Nashville Railroad Company, have since been extended, so that it now owns, controls, and operates a system of railroads running from Cincinnati, crossing the Ohio river at Newport, Ky., to Louisville, Nashville, Chattanooga, Decatur, Montgomery, Mobile, New Orleans, and other southern cities. Under the requirements of its charter, it has provided, and for many years has had in use, for the accommodation of travel and traffic at Louisville, four separate and distinct freight yards and depots, with ample buildings, platforms, switches, and other facilities, including an adequate force of clerks, inspectors, and employes connected therewith, for the handling of freight and passengers arriving at or leaving that city, which constitutes one of its main terminal points. These four yards are conveniently located; No. 1 being at First and Water streets, near the river front; No. 2 at East Louisville; No. 3 at South Louisville; and No. 4 at Ninth and Broadway streets, in the western portion of Louisville. This latter yard and depot is one of the most commodious in the United States, with every facility and convenience for the safe, rapid, and

cheap handling of traffic. Its character and capacity is correctly stated and described in respondent's answer. This yard, supplied with sufficient switches and sidings, extends southward from Broadway to Oak street, in Louisville. From Oak street to the South Louisville yard the Louisville & Nashville Railroad owns only a right of way 66 feet in width, occupied with double main tracks, with a spur switch on the east side thereof, running down Seventh street, to a work or repair shop of the company. Said four yards, with their buildings and accommodations, have been procured and constructed by respondent at a cost of about $1,500,000, and the same are now worth that sum. From 1872 to October 21, 1887, all freight traffic coming to Louisville from railroads north of the Ohio river, and destined to points south on the line or lines of the Louisville & Nashville Railroad Company, and all freights brought by the Louisville & Nashville Railroad Company from the south, and destined to points north of the Ohio river, were interchanged by and between respondent and all other railroads entering Louisville from the north side of the river, at said Ninth and Broadway yard and depot, which was reached by connections made at Tenth and Maple street, one block west of said yard. The Louisville & Nashville Railroad Company does not engage in the business of a common carrier of interstate commerce to or from points beyond its own lines of road; neither does it hold itself out to the public as a common carrier of such interstate traffic. It has at all times refused to engage in the transportation of freight or passengers to or from points beyond its own line, except when certain agreements or arrangements have been made between itself and the other railroad company or companies whose roads were to form part or parts of the through routes to be thus established. Under the said agreements or arrangements, certain through rates for transportation over the through route or routes are established, and the proportion in which such through rates are to be divided between the different companies comprising the through route are agreed upon; also the proportion in which the respective companies shall share in the losses resulting from such through business, and the terms and conditions to be inserted in the through tickets and bills of lading issued by them respectively. The Louisville & Nashville Railroad Company has now, and for many years past has had, such traffic arrangements with railroad companies reaching Louisville from the north side of the Ohio river, and extending to the cities of St. Louis and Chicago; but such agreements not only prescribe the terms and conditions on which the business shall be transacted, and the rates prorated, but also designate the points and places on the respective railroads between which the through route and the through rate shall apply.

Under the arrangements which the Louisville & Nashville Railroad Company now has, and has heretofore had, with the railroads entering Louisville from the north side of the Ohio river, for through routes and through rates, many points, both on the north and south sides of the Ohio river, reached by the contracting companies, are not included; and through bills of lading and through tickets on the agreed through rates

are only authorized to be issued by the respective parties to such arrangements to and from the points designated by their agreement. If the railroads north of the river, although parties to such arrangements with the Louisville & Nashville Railroad Company, bring freight to Louisville for transportation south via the Louisville & Nashville Railroad Company, in violation of the terms, conditions, and restrictions of the agreement for through route and through rate, or for points other than those embraced in the arrangement, the Louisville & Nashville Railroad Company refuses to receive and transport the same, except at local Louisville rates, treating such freight as a local Louisville shipment. In the absence of express contract, fixing the period during which such arrangements for through routes and rates shall continue, they are subject to change, modification, or abrogation on notice from any of the parties, and are actually changed or abrogated from time to time, as the interest of the companies may dictate or require. Respondent's existing arrangements or agreements with railroad companies entering Louisville from the north side of the Ohio river over the Louisville bridge, for through routeing and through rating, upon agreed *pro rata* division of rates, provide and require that all such traffic shall be interchanged at Tenth and Maple streets, or between Ninth and Tenth streets, near Broadway, where respondent's main freight-yard is located, and where ample facilities have been provided for such interchange. The Louisville & Nashville Railroad Company has never entered into any arrangement with the petitioner for the interchange of interstate traffic on through routes and at through rates, and refuses to receive such freight from it, except the same be delivered at oné of respondent's freight stations, where respondent will receive such freight, issue proper bills of lading therefor, and transport it upon precisely the same terms and conditions on which like kind of property is received and handled for other Louisville shippers.

It is shown by the evidence that arrangements for joint through routes and through rates which create and establish a *quasi* partnership and agency relation between the parties thereto are always, and necessarily, the subject-matter of private contract or agreement between the railway companies over whose roads the traffic is conducted, based upon various considerations,—such as the division of rates, the solvency, reliability, and promptness of the respective lines; their ability to furnish equipment and suitable facilities for the dispatch of business; their ability to deliver business to the through line, or the traffic each can furnish; the mileage rate to be paid or allowed on cars passing on or over each other's line; the method of adjusting losses; the effect upon their other traffic, etc. From 1850 to 1872 traffic crossing the Ohio river at Louisville had to be transferred by means of ferry-boats, which was attended with great expense, delay, and trouble, and often subject to serious interruptions, by low stages of water, and ice on the river. To remedy this condition of things, the Louisville Bridge Company was incorporated by the state of Kentucky, March 10, 1856, with powers to construct a railroad bridge across the Ohio river at Louisville. By an amendment to the charter,

made in 1862, the bridge company was authorized to contract with any railroad company incorporated under the laws of the state of Kentucky or any other state of the United States, to warrant the annual profits of the bridge to be built by said company to be equal to the keeping of the bridge in repair, and of its operation, and that the net earnings should be equal to 6 per cent. on the cost of $1,000,000. It was further authorized to contract at any agreed sum or rate with any railroad company chartered by the state of Kentucky or any other state of the United States for the annual use of said bridge by the cars, or for the purpose of said railroad company; and any railroad company incorporated by the state of Kentucky was authorized to subscribe to the stock, or make the guaranties and agreements authorized by the charter. The bridge was declared to be a lawful structure by an act of congress approved July 14, 1862. This act was amended in 1865, so as to authorize the Louisville & Nashville Railroad Company and the Jeffersonville Railroad Company to construct a railroad bridge over the Ohio river at Louisville. Under these acts of legislation the capital stock of the Louisville Bridge Company was subscribed for by the Jeffersonville, Madison & Indianapolis Railroad Company, the Louisville & Nashville Railroad Company, and other corporations, and by individuals. The Louisville & Nashville Railroad Company owned $300,000 of the stock until December, 1880, when it ceased to be a stockholder.

On June 5, 1872, upon the completion of said bridge, a written contract was entered into between the Louisville Bridge Company of the first part, the Jeffersonville, Madison & Indianapolis Railroad Company of the second part, the Ohio & Mississippi Railway Company of the third part, and the Louisville & Nashville Railroad Company of the fourth part, in which it was recited that the capital stock of the bridge company was $1,500,000; that its mortgage debt was $800,000, evidenced by bonds to mature December 1, 1888, bearing interest at 7 per cent., payable semi-annually. The contract provided that the second, third, and fourth parties agreed to use the bridge as covenanted therein; that the tolls and charges over and for the use of the bridge and its tracks in the transportation of freight, passengers, mails, and other goods received from or delivered to the roads of said second, third, and fourth parties per ton, and per passenger, or per car, engine, or other means of transfer over said bridge, shall be fixed on signing this agreement, and shall not be in excess of a toll or charge sufficient to produce in the aggregate a sum equal to the cost and expense of keeping in repair and taking care of said bridge, paying a dividend semi-annually of 6 per cent. on the capital stock of $1,500,000, the interest upon the bonds as the same shall become payable, a sinking fund sufficient to pay off the bonds of $800,000 at maturity, the amount necessary to keep up the corporate organization of the first party, with its proper officers and servants, and such taxes as may be chargeable against the bridge company on said bridge or other property appertaining thereto, or otherwise; that the charges and tolls shall from year to year be reduced in proportion to the reduction of interest on the bonds by the operation of said sinking fund, and the tolls and

charges shall always be the same to each of the second, third, and fourth parties; that the tolls and charges to other railroads or railroad companies for like use of the bridge and the approach owned by the first party shall not be less than those charged to or incurred by the parties to the contract; that all such tolls and charges paid by other railroads or other railroad companies shall be applied to and form a part of the fund provided for the payment of expenses, sinking fund, interest, dividends, and taxes, the same as if paid by the second, third, and fourth parties to the contract. The parties of the second and third parts agree that they will pass over the said bridge all the freight, passengers, mails, express matter, and other goods carried on or over their roads to and from Louisville, and to and from points which require their passage over the Ohio river at or near Louisville, during the existence of the agreement, and will pay punctually to the bridge company the tolls and charges for the use by them of the bridge, tracks, and approaches owned by the bridge company.

The Louisville & Nashville Railroad Company covenanted with each of the other companies to deliver to the Louisville Bridge Company, to be passed over the said bridge, or to the parties of the second or third part, or to such other railroad company or companies as may, for the time being, be transporting freight, passengers, mails, express matter, and other goods over the bridge, all the freight, passengers, mails, express matter, and other goods carried on or over its roads, or any part thereof, destined for any points which require their passage over the Ohio river at or near Louisville, during the existence of the agreement, and will charge on said traffic, in addition to its rates for transportation service, the then established rates of tolls and charges provided for the use of said bridge and approaches, and punctually pay the said tolls and charges to the first party. The approach to said bridge at the north end was owned by the Jeffersonville, Madison & Indianapolis Railroad Company; and the Ohio & Mississippi Railway Company agreed with the Jeffersonville, Madison & Indianapolis Railroad Company to use said approach to said bridge in going into and over it, and it was agreed between them that all the trains, cars, and engines passing over the approach and over the bridge shall be under the control and direction of the Jeffersonville, Madison & Indianapolis Railroad Company, and that whatever rules are prescribed for the government of the trains, cars, and engines of that company shall be equally applicable to the trains, cars, and engines of the Ohio & Mississippi Railway Company, each being dealt with alike; and the Jeffersonville, Madison & Indianapolis Railroad Company covenanted to furnish all needful and sufficient engines for the service so provided for, and at all times to transfer with the same promptness and care over said bridge the trains, cars, engines, and traffic of the third and fourth parties that it does the trains, cars, engines, and traffic received from or to be delivered to its own road, it being intended that each of the parties shall enjoy equal facilities over the approach and the bridge. A reasonable compensation is provided for, to be paid to the Jeffersonville, Madison & Indianapolis Railroad Company for the service to be rendered, to be apportioned between the parties to the contract, in pro-

portion to the service to each. It is further provided that the contract shall continue in force and operation until it shall be terminated by some one of the parties thereto giving notice in writing to the other parties of its intention to terminate the same at the expiration of two years from the giving of such notice; at the expiration of two years, the same shall terminate as to all the parties thereto, included in such notice. When said contract went into operation, and to provide for the interchange of the traffic as therein contemplated, the Louisville & Nashville Railroad Company, at its own expense, constructed freight platforms and improvements therefor on the south side of Maple street, in Louisville, near Tenth street, at which point connection was readily and easily made with the tracks of the Louisville Bridge Company and the Jeffersonville, Madison & Indianapolis Railroad Company, running south from the river along Fourteenth street.

On May 22, 1873, the Louisville & Nashville Railroad Company, the Jeffersonville, Madison & Indianapolis Railroad Company, and the Ohio & Mississippi Railroad Company, designated as the parties of the first, second, and third parts, respectively, entered into a written contract, whereby the first party leased to the second and third parties a portion of the ground and terminal facilities then occupied jointly by the three parties, and situated on the south side of Maple street, in Louisville, between Eleventh and Tenth streets, and on Tenth street, where interchange of traffic had been and was being effected between them, for which the second and third parties were to pay the first party $200 per month; the proportion of said sum which the second and third parties were respectively to pay being graduated according to the number of car-loads of freight transferred for each by the first party. Said second and third parties were also to pay the first party the sum of $7,515.30, being one-half of the actual cost of the improvement, consisting of platforms, etc., made on said ground; the proportion which the second and third parties were to pay of said sum being 57 per cent. for the former, and 43 per cent. for the latter. The agreement further provided that when said parties of the second and third parts should pay said amount, with interest from January 1, 1873, they should be joint owners, with the first party, of said improvement, in proportion to the amounts paid towards the whole cost of the same, viz., $15,030.58. The contract provided for the readjustment of this one-half ownership in the building from year to year, on the basis of the work done at said transfer platform, for said second and third parties, respectively. The lease was to continue for five years, after which it was optional with the first party to continue the same. The arrangement was not terminated at the expiration of five years, but was continued thereafter by the parties to the same. The Louisville & Nashville Railroad Company having, some years after the execution of said contract, changed its track-gauge to conform to that of other roads north of the Ohio river, and constructed much more commodious platforms and buildings and large yards, at Ninth and Broadway streets, about four or five hundred feet east of the Maple-Street platform, it was agreed between said parties that their interchange of traffic should take place at that

point; and it was accordingly done at said Ninth and Broadway yard and depot, until terminated by the Ohio & Mississippi Railway Company, as hereinafter stated. On May 16, 1888, the Louisville & Nashville Railroad Company and the Louisville Bridge Company entered into a written contract, which, after reciting the said contract of May 22, 1873, and that it was for the mutual benefit of the parties thereto that the location of said union (or Maple-Street) transfer platform should be changed, and the business conducted on the ground of the Louisville & Nashville Railroad Company, situated on the south side of Broadway street, between Ninth and Tenth streets, provided that the second party, and all railroad companies running cars over its bridge, subject to the right reserved to admit any other railroads not using said bridge, should have the joint use of said yards, platforms, and buildings of the first party, located at Ninth and Broadway, (designated in the record as "Yard No. 4;") that for such joint use the second party (the Louisville Bridge Company) agreed to pay a monthly rental of $200, and, in addition thereto, such proportion of the interest at 6 per cent. per annum, upon the cost of said transfer platform and tracks, as the number of cars handled for the second party bears to the total number of cars handled. Said contract further provided that the expense of the operation of said transfer platforms and tracks (viz., labor of loading and unloading, clerk hire, maintenance, and repair, etc., premiums of insurance, and taxes which might be lawfully levied and assessed upon said property) should be divided between the parties to the agreement, in the proportion that the number of cars handled at said platforms for each party, and for any other railroad companies that might thereafter be admitted to its use, bears to the total number of cars so handled; "it being understood, that the total number of cars shall not only include cars handled for the first party and the railroad companies using the second party's bridge and tracks, but also such as may be handled for other parties hereafter admitted to the use of said transfer platforms and tracks;" and it was further agreed that "other railroad companies than those now using the bridge and tracks of the second party may also be admitted to the joint use of said transfer platform and tracks, on the terms herein set forth,—that is to say, that they will bear their proper proportion of the ground rent, interest on the cost of the platforms and tracks, and the expense of maintenance and operation of the said platforms and tracks, based upon the number of cars handled, as per the second and third articles hereof." The switching of cars to and from said transfer platforms was to be done by the Louisville & Nashville Railroad Company, between the points of the old joint siding on south side of Maple street, without cost to the second party. The contract provided for a readjustment of the monthly rental from time to time, upon certain terms, not necessary to notice, and the arrangement was to continue in force until terminated by six months' notice in writing from either party. It is still in full force and operation as between respondent and the Louisville Bridge Company, and all the railroad companies entering Louisville from the north side of the Ohio river, except the Ohio & Mississippi Railway Company, which latter company

ceased to make its transfer of traffic with respondent at said Ninth and Broadway yards in February, 1888.

While this contract bears date in May, 1888, its terms and provisions were agreed upon and arranged in January, 1888, with the knowledge and consent of the Ohio & Mississippi Railway Company. Since the aforesaid contract of June 5, 1872, was entered into, the Louisville, Evansville & St. Louis Railroad Company, and the Louisville, New Albany & Chicago Railroad Company have been allowed to use, and are still using, said Louisville bridge and approaches, in substantial accordance with the terms and provisions thereof. Said railroad companies also make their transfers and interchanges of freight traffic with respondent at said Ninth and Broadway yard. Since the date of said contract the rates of tolls and charges have decreased per ton and per passenger, as the volume of traffic over the bridge has increased. About eight years ago the dividends agreed to be paid upon the capital stock of the bridge company were reduced from 6 to 4 per cent. semi-annually, and under the operation of said contract the sinking fund therein provided for is now sufficient to pay off the bonds of the bridge company, which mature in December, 1888. Under the operation of said contracts of June, 1872, and May, 1873, the business between the railroads north of the Ohio river and Louisville & Nashville Railroad Company was conducted in this manner. The parties having established the yard of the Louisville & Nashville Railroad Company at Ninth and Broadway, in Louisville, as the point for the interchange of traffic, the railroads from the north brought their cars to their respective yards on the north side of the river. From there they were hauled by the Jeffersonville, Madison & Indianapolis Railroad Company, for the Louisville Bridge Company, to the yards of the several companies, on the south side of the river; and cars containing freight to be delivered to the Louisville & Nashville Railroad Company were then, by the Jeffersonville, Madison & Indianapolis Railroad Company, switched over Fourteenth and Maple streets to respondent's yard and transfer station at Ninth and Broadway, where they were received, and the goods in less than car-load lots were assorted, distributed, and reloaded into cars, and placed in trains, for their proper destination. Car-load lots were generally transferred to proper tracks, and placed in trains, destined to points of shipment. Cars coming over respondent's road from the south, containing goods destined to points north of the river, were brought to the same yard, and delivered at the Maple and Tenth street platform and tracks, where the Louisville Bridge Company, or the Jeffersonville, Madison & Indianapolis Railroad Company, acting as its switchman, received the same, and transferred the freight to proper points on the lines of the railroads north of the river. The expenses connected with such interchange of traffic, together with a rental allowance to respondent for the use of its terminal facilities, as shown by said contract of May, 1873 and 1888, was borne by the several railroad companies *pro rata*, all companies interchanging business with respondent being placed upon the same footing, and all furnished the same facilities. The interchange of traffic continues in the same manner, at said point, as

to all the roads north of the Ohio river, except the Ohio & Mississippi Railway Company, which, on February 4, 1888, gave notice that it would, and did, withdraw from said contracts, at noon on that day. Said Ohio & Mississippi Railway Company has, since its withdrawal from the contract of June 5, 1872, ceased to interchange traffic with respondent at Ninth and Broadway, as formerly, and now conducts its business over the Kentucky & Indiana Bridge Company, which was chartered by the state of Kentucky in 1880, and completed its bridge across the Ohio river, between New Albany and Louisville, in 1886. Its charter provisions and powers, as conferred by the laws of Kentucky, so far as material to this case, are as follows:

"Said Kentucky & Indiana Bridge Company is hereby empowered to locate, build, construct, and maintain, under the laws of the United States, a bridge for railway, wagon, street railway, and other purposes, between the cities of Louisville, Ky., and New Albany, in the state of Indiana, from any convenient and accessible point within the limits of the city of Louisville, or within one mile thereof; and said company is hereby clothed with all the powers, privileges, rights, and franchises, necessary for the carrying out the purposes named herein. Said corporation shall have the power to lay down on said bridge a single or double track for railroad cars or street cars, or for wagons or other vehicles, and all animals, and to erect footways for passengers, and to charge for the use thereof reasonable tolls; and for said purpose may erect on either or both sides of said bridge toll-gates, and may do all other acts or things necessary for collecting the charges for the use of said bridge, and may also run any line of railways through the city of Louisville upon such terms as may be prescribed by ordinance of said city of Louisville, or along any street or alley, to connect with any railway, bridge, transfer company, or depot; and shall have the right to operate or lease said connecting line or lines, and may charge a reasonable compensation for the use of the same. Said corporation may contract with any railroad company in or out of this state for the use of said bridge by its cars and engines, or for other purposes; and any railroad, or street railway, or person, or municipal corporation, in or out of this state, may subscribe for the capital stock of said corporation, upon any terms or conditions agreed upon, and may make such contracts or agreements as may be deemed expedient for the use, management, or control of said bridge. Said Kentucky & Indiana Bridge Company is authorized to contract with or to construct any railway or terminal line, either in Kentucky or in the state of Indiana, which may be necessary for completing its terminal facilities, and it may construct such line or lines in the county of Jefferson, state of Kentucky, as may be necessary to complete the connection with other railways or depots. Said Kentucky & Indiana Bridge Company is authorized to contract with any company organized under the laws of the state of Kentucky for the erection of said bridge, and the construction of any terminal lines connecting with it, and to pay for the same in bonds or stock of said company, at such price as may be agreed upon. Said Kentucky & Indiana Bridge Company is authorized to contract with or to construct any railway or terminal line, either in Kentucky or in the said state of Indiana, which may be necessary for completing its terminal facilities; or it may extend such branch lines through the city of New Albany, state of Indiana; and it may construct such line or lines in the county of Jefferson, state of Kentucky, as may be necessary to complete the connection with other railways or depots. Said Kentucky & Indiana Bridge Company is authorized to connect its line with the line of the Short Route Transfer Company, and for that purpose may cross other railway or bridge lines, passing either under or over the same    The

said company is also authorized to cross the land of other railway or bridge companies, in case it may be necessary, in running its connecting lines. The Kentucky & Indiana Bridge Company shall have the right and power to condemn any land in the city of Louisville, or county of Jefferson, state of Kentucky, that may be necessary or proper for the construction or maintenance of any line of railway which said company is authorized by its charter, or amendment or amendments thereto, to construct, maintain, or operate."

On March 2, 1881, under a general law of the state of Indiana, providing for the incorporation of companies formed for the purpose of constructing bridges for railway or common roadway purposes, or both, over rivers and streams forming the boundaries of said state, certain parties adopted articles of association "for the purpose of constructing, operating, and owning a bridge for railway and common roadway purposes, over and across the Ohio river," between New Albany and Louisville. The association was styled the "Kentucky & Indiana Bridge Company," and the articles recited that "the object and purpose of said company is to construct, own, and operate a bridge from a point in said city of New Albany, across the said Ohio river, to a point in said city of Louisville, for both railway and common roadway purposes, together with, as an extension of and in connection with said bridge, a firm and substantial causeway," etc. The statutes of Indiana empowered said company "to construct a railway with one or more tracks from said bridge and embankment, and to connect the same with other railway tracks, and to fix the rates of toll for persons and property passing over said bridge and tracks connected therewith, whether in cars propelled by steam or otherwise." The company, under the statute, had authority "to connect the line of railway over said bridge by continuous line of railway, in such manner, and upon such route and terms, as may be deemed most expedient, with any other line of railway whatever; and to maintain, use, operate, and control the said connection, when completed, and charge and receive tolls for the use thereof." The two bridge companies thus formed under the laws of Kentucky and Indiana were, on March 10, 1881, consolidated under the same name. Whether such consolidation was effected under proper legislative authority, does not appear. The bridge was built by the consolidated company, which thereafter, on September 29, 1886, entered into a written contract with the Ohio & Mississippi Railway Company, the important provisions of which are the following:

"The bridge company agrees to allow the railway company to run its locomotives, cars, and trains over the Kentucky & Indiana bridge and approaches, from a convenient point of connection at Vincennes street, New Albany, to the ground of the railway company at Fourteenth street, in Louisville, or, should the railway company elect to do so, to a connection with the track of the Short Route Railway Transfer Company, near Thirteenth street, in Louisville; the railway company's locomotives, cars, and trains to have preference over those of a similar class of other railroad companies that may use the bridge, so far as such preference can be legally granted by the bridge company." The bridge company is to keep its bridges, approaches, and lines of railway in repair at its own expense; it agrees "to establish, provide, and maintain tracks connecting its present tracks with the tracks of all other railroads now seeking New Albany, within a reasonable time, either directly, or

through the use of the other railway lines, and to switch the cars of the railway company, over such connecting tracks, at a switching charge of $1 per car; also, to transfer cars from the railway company's transfer yards south of Bank street, in Louisville, to the Louisville & Nashville Railroad, or the Chesapeake, Ohio & Southwestern Railroad at the same rate per car." It is agreed that "the tolls shall be fixed at the same rate, from time to time, as the rate of the Louisville Bridge Company, and these tolls shall be paid monthly by the railway company to the bridge company; it being provided, however, that whenever the sum so collected shall exceed the sum of $17,500 per quarter, any excess over such amount shall be paid back to the railway company; but the railway company agrees to pay to the bridge company $17,500 per quarter, whether or not the amount of tolls so collected equals that sum, the intention being to give a fixed annual rental to the bridge company of $70,000 per annum." But the railway company is to "endeavor, with reasonable dispatch, to clear itself of future liability for tolls, rentals, charges, or otherwise, under its present contract for the use of the Louisville bridge, and until such liability shall be removed the railway company shall not be compelled to pay any tolls hereunder to the bridge company. And the Kentucky & Indiana Bridge Company may, at its own cost, and in the name of the said Ohio & Mississippi Railway Company, defend against any claim of liability on the part of said Ohio & Mississippi Railway Company under said contract. The railway company agrees * * * to carry and transport over said bridge, approaches, and railway tracks, all of its locomotives, cars, freight, passengers, mails, express matter, and everything else carried or transported by it on its own lines * * * destined, consigned to or from Louisville, or to or from points which require their passage over the Ohio river at or near Louisville: provided, however, that said railway company is at liberty, if it so desires, to perform its passenger service over any other bridge; but the rental to be paid hereunder shall not be decreased by reason thereof. The interchange of freight at Louisville and New Albany between said railway company and any connecting road shall be done over the tracks of the bridge company, between the south approach to its bridge and the tracks of such connecting road, so far as the Ohio & Mississippi Railway Company can lawfully control the same, and the charge for the use of such tracks shall not exceed that on any other line. The railway company agrees, so far as it lawfully may, not to carry or transport over the said bridge and the approaches and tracks thereto any locomotives, cars, freight, passengers, mail, and express matter, between Louisville and New Albany, that originates in or comes from any railroad or water line entering the one place, and destined for the other, it being mutually understood and agreed between the parties thereto that the bridge company shall have the sole, exclusive right to control, carry, and transport over the bridge and the approaches and tracks thereto all traffic not received from or destined to points reached over the railroad of the railway company, north and east of New Albany. The railway company agrees to furnish, at its own cost, all power necessary for the transfer of its locomotives, cars, freight, passengers, mails, and express matter transported by it, over the said bridge and the approaches and tracks thereto."

Said contract was to continue in force and in operation 20 years from the date of commencement of payment of tolls by the railway company to said bridge company, and it is still in full force, and being acted upon by said parties.

On June 21, 1887, the petitioner entered into a written contract with the Louisville Southern Railroad Company, which connects Louisville with the south by way of the Cincinnati Southern Railroad, under and

by the terms of which said bridge company leased to the Louisville Southern Railroad Company, for a period of 99 years, an equal right to possession and use in common with it for railroad purposes, the railroad, right of way, road-bed, main and side tracks, switches, telegraphs and telegraphic facilities, and other appurtenances and fixtures, now possessed or owned, or which may be hereafter possessed or acquired by the Kentucky & Indiana Bridge Company, between a point in Magnolia avenue, where the Louisville Southern Railroad Company's tracks join with those of the Kentucky & Indiana Bridge Company, to the connection with the tracks leading to the yard of the said Louisville Southern Railroad Company, on or near the line of Hardin street, between Bank and Market streets, in Louisville.  The parties to said contract agreed to construct a line of track, with the necessary switches and sidings, eastwardly along Magnolia avenue, from the junction of the Kentucky & Indiana Bridge Company's and the Louisville Southern Railroad Company's tracks, to a connection with the main tracks of the Louisville & Nashville Railroad Company at or near the intersection of Magnolia avenue and Seventh street, said connection to be constructed and maintained at the joint expense of the Kentucky & Indiana Bridge Company and the Louisville Southern Railroad Company, in the manner described in said contract.  The Louisville Southern Railroad Company agreed to provide and keep a sufficient number of suitable switch-engines on hand, and to handle promptly and with dispatch all freight cars to be moved between the Kentucky & Indiana Bridge Company's transfer tracks, between Bank and Market streets, and the Chesapeake, Ohio & Southwestern Railroad Company's railroad, and the Louisville & Nashville Railroad Company's railroad, at a charge to be fixed by the parties to the contract.  The Louisville Southern Railroad Company agreed to pay to the Kentucky & Indiana Bridge Company, of the revenue thus obtained, in the following proportion, namely, 55 per cent. to the railroad company, and 45 per cent. to the bridge company.  In case said railroad company fails or refuses to remove all freights passing over this part of said tracks with promptness and dispatch, then the bridge company reserves the right to move said freight, and to receive and collect all tolls due for said service.  The bridge company was not to grant any other party or parties the right to do any switching, or make transfers of cars or freight on the line of road or tracks aforesaid.  Said contract further provided as follows:

"And whereas, the said Kentucky & Indiana Bridge Company has heretofore entered into a contract with the Ohio & Mississippi Railway Company, providing for the transportation of all freight from said railway to the roads south of the Ohio river, over the tracks herein described, and for which a charge is to be made by said bridge company:  Now, it is agreed, and it is part of the consideration of inducing the bridge company to enter into this agreement, that all such freight coming from the said Ohio & Mississippi Railway Company, and delivered and deliverable to the said railways south of the Ohio river, shall be moved over the tracks herein described, from the yards on Hardin, between Bank and Market streets, to such railways, without charge or cost, and shall be made by the railroad company, with its engines, at rates to be fixed by the bridge company, and the tolls or revenue

derived from such freight so moved shall belong exclusively to the bridge company, and shall not be subject to division, as herein provided for the revenue derived from freight moved or handled on said tracks."

Said contract was to continue in force for and during the whole period of 99 years from and after September 1, 1887. It has not since been changed or modified, and the business being done between petitioner and said Louisville Southern Railroad Company is carried on and transacted under and in pursuance of the provisions of said contract. The Louisville Southern Railroad Company has not, however, fully performed the switching service on the tracks of the Kentucky & Indiana Bridge Company, as it undertook to do. It has only done said switching from Thirty-Second and Market streets, south, at night, using one engine. The rest of said switching has been done by the Kentucky & Indiana Bridge Company. All the transfer slips or bills on freight so switched are made out by the Kentucky & Indiana Bridge Company, which collects the charges therefor from the company or companies for whom the service is performed. The petitioner and the Ohio & Mississippi Railway Company and the Louisville Southern Railroad Company have a yard near Thirty-Second and Market streets, in Louisville, at which said companies' interchanges of traffic are made.

Petitioner's tracks in Louisville branch in two lines, the point of divergence being near the intersection of Twenty-Ninth and Rudd streets. From this point one of said lines extends eastwardly near the canal-bank to a point on Thirteenth street, where it connects with the road of the Short Route Railway Transfer Company, over which and the Chesapeake, Ohio & Southwestern road, running eastwardly, petitioner and railroads using its bridge can readily connect with respondent's yard No. 1, at First and Water streets, and extending thence to Preston street. Petitioner's other line extends southwardly to Magnolia avenue, where it connects with the Louisville Southern. Under several ordinances of the city of Louisville, passed from time to time, petitioner was given authority to construct and extend its tracks in or over certain designated streets in said city. The ordinance which conferred upon said bridge company the right to lay its tracks on or along Magnolia avenue was approved April 12, 1887. It granted to said bridge company the right "to locate, construct, maintain, and operate a single or double track railway, with necessary switches, turnouts, sidings, crossings, signals, and watch-houses, along Magnolia avenue from Eleventh to Eighteenth streets, and along other land acquired or to be acquired, west from Eighteenth street to the city limits, and to connect, with proper curves, with the Chesapeake, Ohio & Southwestern Railway, and the Louisville Southern Railroad, and other railroad lines which may hereafter desire to make connections with the same." By the second section of the ordinance the said bridge company was required, under proper regulations for the safe and convenient use of said tracks constructed between the points named, to "permit other roads now built or hereafter to be constructed desiring to connect through such portions of the city to use the railway tracks laid down or constructed through and along said line as

herein provided, upon conditions, however, that before entering on the use of said tracks any railway company shall pay to the Kentucky & Indiana Bridge Company its *pro rata* share of the cost of constructing the same, including damages awarded by reason of the construction thereof, and shall bind itself, by contracts with the city of Louisville, for the benefit of all parties interested, that it will contribute its *pro rata* share towards the repair and maintenance of any additional tracks, and of any gates, approaches, culverts, bridges, or trestles, or fills that may be necessary to the safe and efficient use of said tracks, and towards the maintaining of such watchmen as may be necessary to the proper guarding of the street crossings," etc.   Similar provisions are found in the other ordinances.   This ordinance of April 12, 1887, is the only one produced which gives said bridge company authority to locate its tracks on Magnolia avenue, and grants the right from Eleventh street westward.

Respondent's tracks at the intersection of Seventh street and Magnolia avenue are located eight hundred and twenty feet, or over two squares, to the eastward from Eleventh street.   The said bridge company has shown no authority or license from the city of Louisville to extend its line or track from Eleventh street eastward along Magnolia avenue to the Seventh street and Magnolia crossing, or to a connection with respondent's tracks at that point; but it has actually made such an extension, and on the 20th of October, 1887, effected or formed a physical connection of its track with respondent's main line, at Seventh street and Magnolia avenue.   This connection was made under the following circumstances: The vice-president and general manager of the said bridge company, under date of September 6, 1887, addressed to the vice-president of the Louisville & Nashville Railroad Company a note as follows:

"DEAR SIR:   The Kentucky & Indiana Bridge Company desire a connection with your road, at the corner of Seventh street and Magnolia avenue, for the purpose of mutual interchange of freight, between your road and the various other roads with which the Kentucky & Indiana Bridge Company, as a transfer company, connects.   At Seventh street and Magnolia avenue there are two private switches connected with your road,—the one belonging to the Union Warehouse Company, and the other to Mrs. Bullitt and the Bank of Louisville.   If we should make arragements with either of these parties for the use of their switch, is it satisfactory to you for us to make connections at that point, provided your present rights of connection with the property of these parties *is not interfered with?"*

The Louisville & Nashville Railroad Company objected to the desired connection at said point, and to the bridge company's use of said private switches.   The matter was referred to their respective attorneys.   The attorney for the Louisville & Nashville Railroad Company advised its officers that under the eighteenth section of its original charter respondent could not lawfully object to or prevent the proposed connection, but that such connection would not, under a decision of the Kentucky court of appeals, cited, necessitate or require a business connection at said point, or confer any right on the bridge company to use its track, or run cars over its road.   The bridge company having the right to thus force a

physical connection, the Louisville & Nashville Railroad Company thereupon, on October 14, 1887, withdrew its opposition to such connection, and it was made October 20, 1887. Said point of connection, at Seventh street and Magnolia avenue, is situated between the South Louisville yard and the Ninth and Broadway yard and station of respondent. It is 1.17 miles south of the Ninth and Broadway station, and 1.83 miles north of the South Louisville yard. Between said yards respondent's trains and engines are constantly passing and repassing, day and night. The Louisville & Nashville Railroad Company neither receives nor delivers freights at said connection, either for private parties or other railroads. It has never been established or recognized as a station or place at which freight should be received or delivered. There are no buildings, platforms, sheds, or other facilities at said point for the interchange of business traffic, nor has either petitioner or respondent any ground or land at that place on which such buildings, platforms, and facilities suitable and convenient for the interchange of freights, and the accommodation of clerks and employes, could be erected. Respondent has only 66 feet right of way at said point, which is needed for its tracks; while the petitioner has not even such right of way, if the license or permission of the city of Louisville to lay its track eastwardly along Magnolia avenue from Eleventh street is necessary to confer said right. By means of said connection it is practical to switch freight cars, loaded or empty, from the track of petitioner to the main track of respondent, and *vice versa;* but no interchange of freight cars and freight business between respondent and petitioner and railway companies using petitioner's bridge and tracks can be conducted at said Seventh street and Magnolia connection without subjecting respondent to extra expense, trouble, and inconvenience, beyond what it is required to incur in interchanging with other roads, at its regular yards and stations; and, the greater the traffic to be interchanged at said junction, the greater would be such expense to and burden upon the respondent. The interchange of freights in broken lots, or less than car-loads, cannot be made at said connection. Such freights received from petitioner at said junction have to be hauled 1.17 miles to the Ninth and Broadway depot of respondent, to be assorted and reloaded into cars, and placed in trains for destination. Neither can car-load lots of mixed or miscellaneous freight, destined for different points, be interchanged there, without being transferred to and assorted and reloaded at Ninth and Broadway. If such freights are to be delivered by respondent to petitioner at said point, they have first to be carried to respondent's said depot, there unloaded, assorted, reloaded, and hauled back by respondent's engines, and placed upon petitioner's track. So that, in receiving and delivering less than car-load lots of freight at said Seventh and Magnolia connection, respondent would be put to the expense and trouble of hauling all such freight 2.34 miles without compensation, together with the expense incident to the unloading, distributing, and reloading the same at its Ninth and Broadway station. Freight in car-load lots, interchanged at said connection, would require respondent to switch or haul the same to the same station, to be

there put into or taken from trains, and then carried back to or beyond said point. If petititioner makes such delivery of either car-loads or broken lots of freight at Ninth and Broadway, it involves the use of respondent's terminal facilities. If respondent performs said service, there is involved the use of its engines, its tracks, its platforms, its clerks and employes at said Ninth and Broadway station, for which no compensation has been agreed upon between petitioner and respondent. All such services and matters, as to other railroads entering Louisville from the north side of the Ohio river, and interchanging traffic with respondent at its Ninth and Broadway station, are made the subject of private contract and agreement, under and by the terms of which respondent is allowed and paid a consideration for the use of its engines, tracks, and terminal facilities in the shape of a monthly rental, interest on its improvements, and a *pro rata* proportion of the depot expenses connected with the transfer of freight; such as clerk hire, salary of employes, and wages of laborers, based on the amount of business done for each of said roads. The petitioner has made no offer of such compensation to respondent for the interchange of traffic it seeks at its said connection. The mere reception of car-load lots of freight by respondent at said Seventh and Magnolia junction, without reference to any transfer thereof to said Ninth and Broadway yard and depot, to be put into trains for distribution, would necessitate the employment by respondent of car inspectors, both day and night, to examine the condition of such cars, take their numbers, and keep a record thereof; it not being usual or proper for one railroad company to receive from another company car-load freights without having such cars inspected by its own agents, at the point of reception, to ascertain the condition of the same. This would entail upon respondent some additional expense. If respondent accepted loaded cars at said point of connection, it might or might not have the right to transport the freight to destination in such cars. If it had the right to use, and did use, such cars, it would, besides the expense of getting the same to its Ninth and Broadway station, and placing them in proper trains, be required to pay to the owner thereof wheelage or mileage at the rate of three-fourths of one cent per mile, and be responsible for all damage done the cars while in its possession, or on its road. If respondent had not the right or did not desire to use such cars, it would be under the necessity of not only conveying them to the Ninth and Broadway station, but of unloading and reloading them there, at its own cost and expense.

Petitioner has no freight cars of its own, and can make no reciprocal interchange of cars with respondent. Petitioner never sought to effect a direct connection with respondent's Ninth and Broadway yard. A direct approach to said yard might have been made up Broadway and Tenth streets, with the consent of the city of Louisville; but no application was made for leave to pursue that route, nor was any effort made by petitioner to secure a nearer and more direct connection with respondent's road than at Seventh street and Magnolia avenue. That connection was made in pursuance of petitioner's contract with the Louisville Southern Railroad Company, bearing date June 21, 1887. It is entirely practicable for pe-.

titioner and the railroads using its bridge and tracks to interchange traffic with respondent at the latter's Ninth and Broadway yard and depot, which can be reached by transferring or switching over the Short Route Transfer line, and the Chesapeake, Ohio & Southwestern, and thence up Fourteenth street, over the line of the Louisville Bridge Company, and Jeffersonville, Madison & Indianapolis line, to the junction at Tenth and Maple, where respondent receives from and delivers to other roads all freight to be interchanged. To reach respondent's said yard by this approach involves a switching charge of two dollars per car to the petitioner, or the railroads using its bridge; the Short Route Company and the Chesapeake, Ohio & Southwestern making a charge of one dollar, and the Louisville Bridge Company and the Jeffersonville, Madison & Indianapolis also charging one dollar per car for such switching services. Prior to October 21, 1887, petitioner and the railroads using its bridge and track having freight for the Louisville & Nashville Railroad Company, destined to points on its roads south of Louisville, delivered such freight at said Ninth and Broadway yard, by bringing or having the same brought over said approach or route, and paying therefor switching charges of two dollars per car. The same facilities still exist, and are still open to petitioner and the railroads using its bridge, for reaching respondent's Ninth and Broadway yard, and for the interchange of traffic at said point. In addition to this mode of reaching a connection with respondent, the petitioner and the railroads using its bridge had, and still have, another approach, by way of the Short Route and Chesapeake, Ohio & Southwestern line, to respondent's yard at First and Water streets, in Louisville, which would involve a switching charge of only one dollar per car. These routes, which were open and accessible to petitioner and the railroads using its bridge prior to October 20, 1887, when it made the physical connection at Seventh street and Magnolia avenue, have since continued to exist, and are still available to petitioner, as a convenient means of reaching respondent's regular yards with such freight as it seeks to have respondent transport over its lines. Respondent is willing to accept and receive at its Ninth and Broadway or other yards, all freight brought to it by or over petitioner's bridge, and to transport the same to destination on its lines, at local Louisville rates, such as it charges all other Louisville shippers; but is not willing and declines to accept and transfer such freight, upon a through routeing, and at through rates, such as it has agreed upon with the railroads using the Louisville bridge. This refusal is rested upon the ground that respondent has no arrangement or agreement with petitioner and the railroad companies using its bridge, fixing and defining the terms and conditions upon which such through routeing shall be made, and the through rates prorated between them.

The Louisville & Nashville Railroad Company has at all times, both before and since the passage of the interstate commerce act, refused to engage in the transportation of freight or passengers to or from points beyond its own lines, except where previous agreements or arrangements had been made between itself and other carriers, whose lines were part or parts of the through routes to be thus established, which agreements

prescribed the terms, conditions, and restrictions on which the business should be done, and defined the share which each road was to receive of the through rates.    The interchange of traffic between connecting lines constituting the through route over which such traffic is to be passed at or upon through rates is always a matter of contract between the several companies operating such lines; and such arrangements are, in the absence of express agreement to the contrary, terminable at the pleasure of either party.    Petitioner is not a member of, and has no representation in, any freight or passenger associations, by whom through rates are fixed; and it has never offered or attempted to interchange any passenger traffic with respondent.    Its passenger traffic business to and from the south is done exclusively with the Louisville Southern Railroad Company.    Petitioner has no voice in making the division of through rates on traffic carried over or across its bridge.    Its bridge-toll is the only charge to be paid it by the companies engaged in such through traffic.    Under a contract entered into between them in 1887, the petitioner receives from and delivers to the Louisville, New Albany & Chicago Railroad Company, at New Albany, freights transported or to be transported over its bridge to and from Louisville, said contract being terminable by either party upon 30 days' notice.    Petitioner issues no bills of lading for shipments from Louisville to any points south reached either by the Louisville Southern or the Louisville & Nashville Railroad Companies; nor does it issue any bills of lading for shipments from Louisville to Cincinnati or other points reached via the Ohio & Mississippi Railway Company.    If a consignor at Louisville desired to ship over petitioner's bridge to Cincinnati or other point on the Ohio & Mississippi Railway Company's lines, the latter would issue the bill of lading, and collect the freight.    If shippers at Louisville wished their freight for St. Louis to go over the Kentucky & Indiana bridge, via the Louisville, Evansville & St. Louis Railroad, petitioner would accept and receive such freight on one of its Louisville tracks, provided the cars in which to load the same were furnished by the Louisville, Evansville & St. Louis Railroad Company; would then way-bill such car and freight to the latter road, which would issue the regular bill of lading therefor, and charge and collect its regular transportation rates thereon, and pay to petitioner its bridge-toll for passing over its bridge.    So, if a Louisville shipper desired to ship his goods to Chicago over petitioner's bridge and over the Louisville, New Albany & Chicago Railroad, petitioner would accept such shipments on its tracks in Louisville, if said railroad company would furnish the cars in which to load it, and would bill the same to the Louisville, New Albany & Chicago Railroad, which would perform the transportation service, and charge or collect the freight or fares thereon. So, if New Albany shippers wished to ship goods south over the Louisville & Nashville Railroad, petitioner would accept such shipment, if respondent would furnish the car or cars in which to load it; would then furnish to respondent a way or transfer bill for such car and freights, and respondent would issue its own bill of lading therefor, pay petitioner its bridge-toll for passing the freight over its bridge, and collect its regu-

lar charges for transporting the goods to destination. Petitioner has no freight cars of its own, and neither procures nor furnishes cars in any other manner. On business thus handled, the rates given or charged the shippers are, in some cases, the bridge-tolls and the rates of the railroad over which the shipment has to be carried by the company furnishing the car or cars and performing the service; in other cases the line furnishing such car or cars pays the bridge-toll itself. Jeffersonville, New Albany, and Louisville being grouped, and having the same rates to and from all points south on shipments thus procured by petitioner for respondent, and loaded in cars furnished by respondent, the bridge-toll would be paid by respondent, and to that extent would reduce its regular rate to destination of goods going south of Louisville. The petitioner makes the transfer and delivery of such cars to the road over which the freight is to go, and collects from such road its bridge-toll. In addition to its bridge-toll thus charged and collected of roads for which petitioner may have solicited shipments, petitioner, in some cases, where cars are loaded on its tracks, or loaded cars are received from one railroad to be transported to some other line over its tracks, makes and collects a switching charge from the company for whom the service is performed, ranging from one dollar to three dollars per car. Where the respondent and railroads north of the Ohio river have entered into arrangements or agreements, forming through routes and through rates, as to which the bridge companies are not consulted, and have no voice, the bridge-tolls are first deducted from the through rate, and the remainder of the traffic charges for the service is prorated between the parties forming the through route, according to their agreement. The shipper does not, as a matter of fact, pay the bridge-tolls in every instance, either under such through routeing and through rating or when there is no such arrangement for through traffic. Owing to its competition with the Cincinnati Southern Railroad, which owns its own bridge, and pays no bridge-tolls, respondent, in respect to much of its southern traffic, has to bear the burden of such tolls at Louisville, or deduct such tolls from its rates to Louisville and across the bridge at that point. So, in respect to through rates, competition will force the roads crossing the river at Louisville to fix such through rates as though no arbitrary bridge charge or toll was to be paid or deducted therefrom; and in such cases the roads, and not the shippers, pay said tolls.

From March, 1887, to October 20, 1887, petitioner, to a limited extent, interchanged traffic with, or delivered traffic to, respondent at the latter's yard at Ninth and Broadway, such traffic being brought over the connections reaching Maple and Tenth streets; and in some instances issued bills of lading for such freight, whether at through or local rates does not appear. The Ohio & Mississippi Railway Company continued to interchange with respondent at said yard, under the terms of the contracts of June 5, 1872, and May, 1873, until February 4, 1888, when the said Ohio & Mississippi Railway Company gave notice to the Louisville Bridge Company and to respondent that it would, and did, withdraw from said contract of June 5, 1872, at noon on that day. The

said Ohio & Mississippi Railway Company has since February 4, 1888, ceased to use said Louisville bridge and the connections afforded by that route for reaching respondent's yard at Ninth and Broadway, but instead uses the petitioner's bridge under the contract of September 29, 1886, and through petitioner seeks an interchange with respondent at said Seventh street and Magnolia junction. By the withdrawal of the Ohio & Mississippi Railway Company from said contract of June 5, 1872, and its abandonment of the Louisville bridge, there has been a decrease in the receipts or revenues of said bridge to the amount which would have been derived from the Ohio & Mississippi Railway Company's traffic. This loss to the bridge company amounts to about one-fifth of its income, or about $129,167.17, on the basis of receipts for 1887. Said bridge company has not increased its tolls for 1888, but the loss of the Ohio & Mississippi Railway Company's business has prevented any decrease or reduction in said tolls, which it could and would otherwise have made, if said railway company had continued the use of said bridge, and complied with said contract of June 5, 1872. Said bridge company's revenues are, in part, made up of tolls upon freight interchanged by respondent with the roads using said bridge, and such freights, or the roads themselves, will have to pay an increase of some $27,000 in tolls in consequence of the Ohio & Mississippi Railway Company's withdrawal from the use of said bridge, and the respondent's proportion thereof will amount to about $13,000 per annum.

The respondent is otherwise interested pecuniarily in the tolls of said bridge and in the reduction thereof, inasmuch as under its competition with other routes said tolls to a considerable extent have to come out of its revenues received on through rates, and are not paid by shippers or consignees. Said Louisville Bridge Company for some years past has had surplus revenues, which have been, from time to time, prorated and paid back to certain of the railroads using its bridge. The respondent has received no part of such surplus earnings, and made no demand for it. Whether it is entitled to share in such surplus earnings, is not involved in this controversy. Respondent is, however, interested in having all the earnings of the bridge company, not required to meet the charges provided for in the contract of June 5, 1872, applied in a way to reduce the bridge-tolls, which affect its rates and business. The Louisville Bridge Company can do business over its bridge and terminal lines as cheaply and promptly as the Kentucky & Indiana Bridge Company can over its bridge and terminal lines; and had, in 1888, and prior thereto, and still has, capacity to transact all the business which the railroads crossing the Ohio river were able to bring to it.

The capital stock of the Louisville Bridge Company amounts to $1,500,000. Its bonded debt of $800,000 is paid, or fully provided for. The capital stock of the Kentucky & Indiana Bridge Company is $1,700,000, and its bonded debt $1,400,000. The respondent ceased to be a stockholder in the Louisville Bridge Company in 1880. The Ohio & Mississippi Railway Company never complained of the manner in which it was served over the Louisville bridge before withdrawing from said

contract of June 5, 1872. Its own yards at Louisville, and on the north side of the river, were insufficient for the handling of its business. This occasioned at times some delay in transferring its cars. On one occasion, while the employes of the Louisville & Nashville Railroad Company were on a strike, and the cars of the Ohio & Mississippi Railway Company were crowded in the yards of respondent, it declined to receive other cars from the Ohio & Mississippi Railway, until the latter's cars, which were blocking its yard, were removed. This occasioned some short interruption to the interchange of traffic between them. The yards of respondent and other roads than the Ohio & Mississippi Railway Company were ample for the handling of all the business passing over the Louisville bridge.

The main line of the Ohio & Mississippi Railway Company enters Jeffersonville, Ind., convenient and readily accessible to the Louisville bridge. After entering into the contract with the petitioner, dated September 29, 1886, the Ohio & Mississippi Railway Company extended a branch line from Watson, Ind., a town north-east from Jeffersonville, over a route provided for it by petitioner, to New Albany, Ind., so as to form a connection with the Kentucky & Indiana Bridge Company's line and bridge. While the Ohio & Mississippi Railway Company has the right, under said contract of September 29, 1886, to use petitioner's terminal lines in New Albany, and its bridge and southern approaches thereto, down to said railway company's yard at Hardin and Bank streets, it has not, under said contract or otherwise, the right to use petitioner's lines or tracks in Louisville south of said yard, or out to the junction which petitioner has made with respondent's track at Seventh street and Magnolia avenue; to reach which point its cars and freight have to be switched by the petitioner, or its ally, the Louisville Southern, at or for a switching charge of one dollar per car, which the Ohio & Mississippi Railway Company has to pay petitioner. Nor does it appear from the record that said Ohio & Mississippi Railway Company has any authority, either from the state of Kentucky or the city of Louisville, to extend its own line or track south from its said yard, so as to form a direct connection with respondent, at any point. At said Seventh street and Magnolia avenue connection a limited interchange of traffic was carried on between petitioner and respondent from October 21, 1887, up to and including the 16th of November, 1887, but such interchange was had without the knowledge of the officers of the respondent having authority to direct and sanction the matter. When it was brought to the attention of respondent's officers having authority to control the subject, such interchange was stopped at said point, and respondent thereafter treated all freight coming over its road for petitioner, or points on its tracks, as Louisville city business, and required petitioner to pay the freight and charges thereon before delivery would be made. The expense bills furnished petitioner showed that the business was placed upon respondent's city, and not upon its transfer, books. A number of empty cars were returned to the respondent at said connection, and a considerable number of stock cars were delivered by respondent to petitioner at

said point, under a temporary injunction from the chancery court of Louisville, which injunction was subsequently dissolved.

The car which petitioner tendered on September 12, 1888, at Seventh street and Magnolia junction, and which respondent refused to accept, was brought from Cincinnati, and over petitioner's bridge, by the Ohio & Mississippi Railway Company, to its yard south of the river in Louisville, which was the southern terminus of said railway. From that yard it was placed upon the tracks of the petitioner, and by it switched to said Seventh street and Magnolia connection, under the contract of September 29, 1886, at and for a switching charge to the Ohio & Mississippi Railway Company of one dollar. The transfer slip, which petitioner offered respondent with said freight, specified the rate of 53 cents per 100 pounds, as the charge which respondent was to receive for transporting the car of freight to Columbia, Tenn., its point of destination. It does not appear that Columbia, Tenn., was one of the points to or from which respondent interchanged traffic with other railroads north of the river, upon a through routeing and at through rates; nor does it appear that the rate of 53 cents per 100 pounds, which the transfer slip proposed to allow respondent, conformed either to respondent's rates from Louisville to Columbia, Tenn., or the through rates arranged between respondent and its northern connections over the Louisville bridge. The terms, conditions, and stipulations of the bill of lading which was issued by the Ohio & Mississippi Railway Company to the shippers, or forwarded to the consignee, were not made known to respondent, nor was the rate charge apportioned to it tendered respondent, either before or at the time of offering the freight. Respondent's agents, however, assigned no reasons for refusing to receive and transport said car. There are certain private sidings, constructed under written contracts between their owners and the respondent, connecting with respondent's main tracks, between its Ninth and Broadway yard and its South Louisville yard, to and from which respondent delivers and receives its own cars, loaded or to be unloaded with what is called "dead freight,"— such as lumber and other non-perishable articles,—on the transportation of which respondent charges and collects local Louisville rates. Respondent is fully provided with cars, both freight and passenger, for the transaction of its business, and is unwilling and refuses to transport the cars of other railroads offered it by petitioner, who has no freight cars of its own, and pay mileage for the use of the same; and also declines to deliver its own cars to petitioner, to be carried away from respondent's lines and yards, and look to petitioner either for mileage therefor or damage for injury while in its possession. In the absence of buildings, platforms, sheds, and employes at said Seventh street and Magnolia avenue connection, such as are required and necessary to carry on an interchange of traffic between petitioner and respondent at that point, respondent, in order to comply with the order of the commission, must either allow petitioner and the railroads using its bridge the use of its tracks and terminal facilities, without any provision or arrangement as to the compensation to be paid for the use thereof, or must,

against its will, receive and use cars offered by petitioner, paying mileage thereon, and incurring the expense of switching the same to its Ninth and Broadway yard, there to be put into trains, and again hauled over the same distance; and it must also permit its own cars containing freight consigned to it or to be handled by petitioner, to go into petitioner's possession and be used by it, after respondent has been to the trouble and expense of carrying such freight to its Ninth and Broadway depot, and there unloading, assorting, and reloading, and then bringing the same back to said Seventh street and Magnolia connection for delivery. All other railroads entering Louisville, including the Louisville Bridge Company, having connections, directly or indirectly, with respondent, and interchanging business with it, whether on through or local rates, allow and pay respondent an agreed consideration for the use of its tracks and terminal facilities, and bear their *pro rata* proportion of the expense of handling the traffic interchanged, and also arrange for the mutual allowance and payment of mileage on cars of each used by the other, where cars are interchanged. No complaint is made, nor does it appear that respondent's local Louisville rates of freight charges on interstate traffic are unreasonable. Petitioner's bridge is used principally by the Ohio & Mississippi Railway Company and the Louisville Southern Railroad Company. The latter, being in active competition with respondent from Louisville south to and beyond Chattanooga, interchanges little or no business with the Louisville & Nashville Railroad Company, either directly or through the instrumentality of petitioner. The through business carried or brought by the Ohio & Mississippi Railway Company over petitioner's bridge south constitutes the main, if not sole, traffic which petitioner seeks to have interchanged with respondent at Seventh and Magnolia avenue connection.

On the foregoing statements of facts, and under the pleadings, the leading and important questions presented for consideration and determination are the following:

*First.* Is the commission created by the act to regulate interstate commerce invested with, and does it exercise, judicial powers, such as to make its orders the judgment of a court, which is wanting in constitutional authority, because its members have no such tenure of office as required by the constitution in the establishment of "inferior courts?"

*Second.* What is the nature of the present proceeding in this court? Is this court merely to enforce the order of the commission, and thus exercise a non-judicial power, or is the case in this court to be treated as an original and independent suit, in which its own judgment on the facts and merits may be rendered?

*Third.* Is petitioner, either in law or fact, such a common carrier of interstate commerce, within the scope and contemplation of the act to regulate commerce among the states, as will entitle it to claim the benefits of said law, or to have its provisions enforced in its behalf?

*Fourth.* Is petitioner's connection with respondent's road at Seventh street and Magnolia avenue in the city of Louisville a suitable and convenient point for the interchange of traffic between them and the rail-

roads using petitioner's tracks? And is respondent's refusal to interchange business at said point an unjust and unreasonable discrimination against petitioner?

*Fifth.* Does the law impose upon respondent the duty of making an interchange with petitioner at said connection, if such interchange of traffic involves the use by petitioner, and the roads using its bridge, of the tracks and terminal facilities of respondent, or subjects respondent to expense over and above what it incurs in interchanging traffic with other railroads, at its regular and established yards in Louisville?

*Sixth.* Does the interstate commerce law, rightly construed, require respondent not only to interchange traffic at said point of connection with petitioner and railroads using its tracks, but also to afford and concede to them on such interchange of business the same through routeing, and upon the same joint through rates, which respondent has, by contract, arranged and agreed upon with certain railroads entering Louisville from the north side of the Ohio river? In other words, does said act require that, if respondent has entered into traffic arrangements with one or more railroads connecting with it over the Louisville bridge, for the joint through routeing of business, at or upon through rates, to be apportioned between them, it shall concede to or make with any or all other roads engaged in interstate commerce, and connecting with it at other and different points, and running in different directions, the same or similar arrangements for through traffic, and upon the same joint through rates? And if this is required by the law, is such requirement valid, and within the constitutional power and authority of congress to regulate commerce among the states?

The first and second of said propositions are so connected and dependent upon each other that they may properly be considered together. In respect to the question presented by the first, counsel for respondent takes the position that the interstate commerce law confers judicial powers upon the commission; that such judicial powers are exercised in its proceedings; that its orders are judgments of a court not lawfully created, since its members are not appointed and commissioned in accordance with article 3, § 1, of the constitution, inasmuch as they hold office only for designated periods, and not "during good behavior," which latter "constitutional tenure of office judges must possess before they can become invested with any portion of the judicial powers of the Union;" and that the proceedings before, and the order or judgment of, the commission are and were consequently void. In respect to the second question, it is claimed by counsel for respondent that, aside from the judicial character and power attempted to be conferred upon said commission, the interstate commerce law imposes upon this court non-judicial powers which it cannot properly exercise, inasmuch as it is limited and restricted by the sixteenth section of the act to the mere enforcement of the commissioner's orders, if found to be lawful, with no authority to go into the merits of the controversy between the parties, and make its own adjudication thereon; but if not so limited and restricted to the mere enforcement of an order made by another body, and the proceed-

ing in this court can be regarded and treated as an original and independent suit to determine the rights of the parties, that the court has no jurisdiction of the case, because the parties complainant and defendant are both corporations of the state of Kentucky. In support of their position that judicial powers are conferred upon and exercised by the commission, counsel refer to various provisions contained in sections 12, 13, 14, 15, 16, 17, and 18, of the act, which, together with the rules of practice adopted, show, as they insist, that a proceeding before the commission, like the one in question, involves and embodies features and ear-marks of judicial procedure and action in the following particulars, viz.: *First*, a petition, corresponding with the petition or bill in equity, is filed; *second*, notice is issued for, and service thereof made upon, the defendant or party complained of, conforming to, and corresponding with, the process of subpœna in courts of the United States, requiring such defendant to satisfy the complainant, or to appear and answer the same; *third*, the filing of defendant's answer, as in equity, which makes up or forms the issue or issues; *fourth*, the issuance of subpœnas requiring the attendance of witnesses, or for the taking of depositions, upon the issues made up by the answer; *fifth*, the assignment of a time and place for the hearing, when and where the parties appear in person or by attorney, witnesses are sworn and examined, and arguments are made orally or by brief; *sixth*, when the conclusion is reached, a written report, corresponding in all respects to an opinion, is delivered, filed, and published; *seventh*, the order of the commission is recorded by its secretary, as decrees in equity are recorded by clerks of court; and, *eighth*, a copy of such order, under the seal of the commission, issues to the defendant, requiring obedience thereto. This mode of procedure certainly conforms in many respects to the regular practice of courts, and is no doubt authorized by the law; but does it involve the performance of judicial acts, and the exercise of judicial powers, by the commission, as claimed? It is well settled that congress, in ordaining and establishing "inferior courts," and prescribing their jurisdiction, must confer upon the judges appointed to administer them the constitutional tenure of office,—that of holding "during good behavior,"—before they can become invested with any portion of the judicial power of the government; and if the act to regulate interstate commerce does in fact establish an inferior court, the commissioners appointed thereunder for certain fixed periods are clearly not such judges as can be invested with any portion of the judicial power of the United States, and their decision in matters affecting personal or property rights could have no force or validity. But does the interstate commerce law undertake either to create an "inferior court" or to invest the commission appointed thereunder with judicial functions? We think not. While the commission possesses and exercises certain powers and functions resembling those conferred upon and exercised by regular courts, it is wanting in several essential constituents of a court. Its action or conclusion upon matters of complaint brought before it for investigation, and which the act designates as the "recommendation," "report," "order," or "requirement" of the board is neither final nor conclusive; nor

is the commission invested with any authority to enforce its decision or award. Without reviewing in detail the provisions of the law, we are clearly of the opinion that the commission is invested with only administrative powers of supervision and investigation, which fall far short of making the board a court, or its action judicial, in the proper sense of the term. The commission hears, investigates, and reports upon complaints made before it, involving alleged violations of or omission of duty under the act; but subsequent judicial proceedings are contemplated and provided for, as the remedy for the enforcement, either by itself or the party interested, of its order or report in all cases where the party complained of or against whom its decision is rendered does not yield voluntary obedience thereto. By the fourteenth and sixteenth sections of the act it is provided that the report or findings made by the commission "should thereafter, in all judicial proceedings, be deemed *prima facie* evidence as to each and every fact found."

The commission is charged with the duty of investigating and reporting upon complaints, and the facts found or reported by it are only given the force and weight of *prima facie* evidence in all such judicial proceedings as may thereafter be required or had for the enforcement of its recommendation or order. The functions of the commission are those of referees or special commissioners, appointed to make preliminary investigation of and report upon matters for subsequent judicial examination and determination. In respect to interstate commerce matters covered by the law, the commission may be regarded as the general referee of each and every circuit court of the United States, upon which the jurisdiction is conferred of enforcing the rights, duties, and obligations recognized and imposed by the act. It is neither a federal court under the constitution, nor does it exercise judicial powers, nor do its conclusions possess the efficacy of judicial proceedings. This federal commission has assigned to it the duties, and performs for the United States, in respect to that interstate commerce committed by the constitution to the exclusive care and jurisdiction of congress, the same functions which state commissioners exercise in respect to local or purely internal commerce, over which the states appointing them have exclusive control. Their validity in their respective spheres of operation stands upon the same footing. The validity of state commissioners invested with powers as ample and large as those conferred upon the federal commissioners, has not been successfully questioned, when limited to that local or internal commerce over which the states have exclusive jurisdiction; and no valid reason is seen for doubting or questioning the authority of congress, under its sovereign and exclusive power to regulate commerce among the several states, to create like commissions for the purpose of supervising, investigating, and reporting upon matters or complaints connected with or growing out of interstate commerce. What one sovereign may do in respect to matters within its exclusive control, the other may certainly do in respect to matters over which it has exclusive authority.

We are also clearly of opinion, that this court is not made by the act the mere executioner of the commissioner's order or recommendation, so

as to impose upon the court a non-judicial power. Congress has, in some cases, assigned to federal courts duties which, though of a *quasi* judicial nature, did not come within the judicial power granted in the constitution. Thus the act of March 23, 1792, (1 U. S. St. at Large, 243,) required the circuit judges to examine into the claims of persons asking for pensions, and make report thereon to the secretary of war. The judges of the circuit courts for the districts of New York and Pennsylvania held that the function or duty thus imposed was not judicial. So the circuit court for the district of North Carolina declared that it could not execute that part of the act which required it to examine and report an opinion on the unfortunate cases of officers and soldiers disabled in the service of the United States. *Hayburn's Case*, 2 Dall. 409. In *U. S.* v. *Ferreira*, 13 How. 40, which arose under the act of March 3, 1849, directing the judge of the district court of northern Florida to adjudicate upon certain claims for injuries, and report the evidence thereon, the supreme court held that the authority thus conferred was not "authority to exercise any of the judicial powers of the United States under the constitution." And the judge's decision was held not to be the judgment of a court of justice, but simply "the award of a commissioner." The principle announced in these cases would sustain counsel's position, if this court, under the provisions of the interstate commerce law, is limited and restricted to the mere ministerial duty of enforcing an order or requirement of the commission, whether it be regarded as a judicial or a non-judicial tribunal. But such is not, in fact, the jurisdiction which this court is called upon to exercise. The suit in this court is, under the provisions of the act, an original and independent proceeding, in which the commission's report is made *prima facie* evidence of the matters or facts therein stated. It is clear that this court is not confined to a mere re-examination of the case as heard and reported by the commission, but hears and determines the cause *de novo*, upon proper pleadings and proofs, the latter including not only the *prima facie* facts reported by the commission, but all such other and further testimony as either party may introduce, bearing upon the matters in controversy. The court is empowered "to direct and prosecute, in such mode and by such persons as it may appoint, all such inquiries as the court may think needful to enable it to form a just judgment in the matter of such petition; and on such hearing the report of said commission shall be *prima facie* (not conclusive) evidence of the matters therein stated." No valid constitutional objection can be urged against making the findings of the commission *prima facie* evidence in subsequent judicial proceedings. Such a provision merely prescribes a rule of evidence clearly within well-recognized powers of the legislature, and in no way encroaches upon the court's proper functions. *Holmes* v. *Hunt*, 122 Mass. 505. It is further provided in said sixteenth section that when the subject in dispute shall be of the value of $2,000 or more either party to such proceedings before said court may appeal to the supreme court of the United States, under the same regulations as now provided by law in respect of security for such appeal. In view of these provisions relating to the substance of the

proceeding in this court, and clearly indicating its true character as an original suit, we should not be misled by other expressions in that section, which seem to imply that the duty imposed upon the court is only to enforce, in a ministerial way, the requirement of the commission. In the case of *U. S.* v. *Ritchie,* 17 How. 525, which arose under the act of March 3, 1851, (9 St. at Large, 631,) and August 31, 1852, (10 St. at Large, 99,) creating a board of commissioners to settle private land claims in California, and providing for an "appeal" to the district court, the supreme court held that what was called an "appeal" was a mere mode of removing the papers and evidence from the board of commissioners, and the institution of an original proceeding in court, where all questions were to be reheard and re-examined *de novo.* The rule laid down in that case is directly applicable to the present proceedings, and sustains the construction which we place upon the provisions of section 16 of the law under consideration. As an original and independent suit, can the jurisdiction of this court be maintained, inasmuch as both petitioner and respondent are corporations (and therefore citizens of the state of Kentucky?) We think there can be no doubt on this question. The right asserted by petitioner arises and is claimed under a law of the United States, which relates to a subject-matter over which congress had exclusive control. This is sufficient to sustain the court's jurisdiction, independent of the citizenship of the parties to the controversy, since it involves a federal question. The first and second of the above propositions are accordingly ruled against the respondent's contention.

Upon the third inquiry presented, involving the question whether petitioner is such a common carrier of interstate commerce as entitles it to invoke and assert the provisions of the act in its own behalf, or in behalf of other railroads which use its bridge, or for whom it transfers cars, our conclusions are: *First,* that petitioner is certainly a common carrier in fact of interstate passenger traffic between New Albany and Louisville, but that traffic is not involved in this controversy, since petitioner has not offered, nor does it propose to interchange, such passenger traffic with respondent at any point; and, *secondly,* that petitioner is not, in law or in fact, a common carrier of property or freights, within the true meaning of section 1 of the act to regulate commerce, and that in respect to freight which it offers or seeks to have interchanged with respondent at said Seventh and Magnolia connection it is only a transfer company or agency engaged in performing a switching service, for which it demands and receives from the party for whom such service is rendered, not traffic rates on the freight transported or transferred, but simply a switching charge for the shifting of cars, loaded or empty, from one line or connection to another. Little, if anything, can be added to what has been so well said in the dissenting report of Mr. Commissioner Schoonmaker, on the subject of petitioner's legal *status* and character, under its charter and articles of association, the provisions of which are fully set out in the foregoing statement of facts. We concur in the views expressed and the conclusions reached by him, that petitioner's corporate powers fall short of making it a common carrier of property having the right to en-

gage in the transportation of freight for hire. The charter powers and franchises conferred upon petitioner make its bridge and approaches thereto, such as it had authority to construct, a public thoroughfare or highway, for the use of which by railroads, or street cars, wagons, vehicles, animals, and foot passengers it was authorized to charge "reasonable tolls," for the collection of which suitable toll-gates could be established. The word "toll" is, no doubt, sometimes employed in railroad charters to express the charge for transportation, rather than for the use of the structure over which such transportation may be conducted, but it is manifestly not used in that sense when applied to a bridge built and maintained for use by the public, or others engaged in transporting property. The franchises and powers conferred upon petitioner of building, maintaining, and operating its bridge and approaches, designated as its "terminal facilities," do not, in and of themselves, constitute it a common carrier of property; on the contrary, they are appropriately confined to the erection and maintenance of a thoroughfare or public highway, open to the use of others, common carriers and private parties, upon making compensation therefor in the shape of "reasonable tolls." These "tolls" which petitioner is authorized to charge for the use of its bridge are not applicable to, nor demandable for, any transportation service it may perform or be permitted to render. The word, as used in its charter, is strictly applicable to charges for the use of its highway, rather than to compensation for transportation services to be performed by itself. The distinction between such an incorporated bridge or highway, established and maintained for use by common carriers and others, upon paying compensation for such use in the way of "tolls," however graduated, and that of an incorporated common carrier engaged in transporting property for hire, is well defined. It is pointed out and illustrated in the case of *Boyle* v. *Railroad Co.*, 54 Pa. St. 310, and *Railroad Co.* v. *U. S.*, 93 U. S. 442–445. In the latter case, Mr. Justice BRADLEY, speaking for the court, says, (page 451:)

"But it is not alone in charters which contemplate the creation of railroads as public highways that we find evidence of the understood distinction between railroads as mere thoroughfares, and the operations to be carried on upon them by means of locomotives and cars. This is manifest from the fact, amongst other things, that express power is invariably given (if intended to be conferred) to the railroad company to equip its road, and to transport goods and passengers thereon, and charge compensation therefor. This practice evidently springs from the conviction that a railroad company is not necessarily a transportation company, and that to make it such, express authority must be given for that purpose, in compliance with the rule that no power is conferred upon a corporation which is not given expressly or by clear implication."

The rule here laid down applies with more force to the case of an incorporated bridge company, like petitioner, whose charter powers neither expressly nor by any clear implication confer upon the company authority "to equip its road, and to transport goods and passengers thereon, and charge compensation therefor." The powers and franchises conferred

upon petitioner find their legitimate scope and operation in the building, operating, and maintaining of its bridge and approaches thereto, for the public purposes it was intended to subserve,—that of furnishing and forming a highway over which common carriers and others should have the right or privilege of transporting goods or passing, as they pass over a turnpike, a canal, or a ferry, upon paying reasonable tolls for the use of the structure or thoroughfare; and do not in any way constitute petitioner a common carrier of goods, authorized to equip its road, or to charge compensation for transporting goods on or over the same. Nor does petitioner, in the legal sense of the term, act or hold itself out to the public as a common carrier of property, in connection with the railroads on either side of the Ohio river. It has no freight cars. When it solicits or accepts freight upon its tracks on either side of the river for any railroad company, it is compelled to call upon the railroad for whom the freight is intended, or over whose line it is to go, to furnish the cars in which to load the same. Such cars the petitioner merely transfers over its bridge, and delivers to the railroad furnishing the same, charging for its service its regular bridge-toll, which is in no sense a charge for transporting the freight contained or carried in the car or cars. In some cases it makes an additional charge for switching cars which require to be transferred from one connection to another. Its object and purpose in thus constituting itself the soliciting agent for the railroad companies who are willing to provide the cars for the freight it may secure is manifestly to obtain "tolls" for use of its bridge. Again, it is perfectly clear that petitioner cannot be properly regarded as a common carrier of the interstate freight transported over its bridge by the Ohio & Mississippi Railway Company, for the obvious reason that said bridge and approaches thereto to and from the yard and depot of the Ohio & Mississippi Railway Company at Hardin and Bank streets, in the city of Louisville, under the terms of the contract of September 29, 1886, between petitioner and said railway company, and under the provision of section 1 of the act to regulate commerce, constitute a part and portion of the Ohio & Mississippi Railway Company's lines, over which said railway performs its own transportation service. The provision of section 1, referred to, provides that "the term ' railroads,' as used in this act, shall include all bridges and ferries used or operated in connection with any railroad, and also all the road in use by any corporation operating a railroad, whether owned or operated under a contract, agreement, or lease; and the term ' transportation' shall include all instrumentalities of shipment or carriage." Having, by contract with the petitioner, not only acquired the right to use said bridge and approaches, but secured for its engines, cars, and trains a preference over all other railroads in such use, down to its southern terminus in the city of Louisville, and being in the actual use thereof under said contract, during the period covered by the present controversy, the Ohio & Mississippi Railway Company must, for the time being, be regarded as the owner or operator of said bridge and approaches, under the above provision of law, as to all freights transported by said company; and the through

traffic which it carries over said bridge to its yard and depot in Louisville is in no sense either handled or moved by petitioner as a common carrier. In thus making the bridge and approaches a part or portion of the line of the railroad which uses or operates it under contract, there is a clear implication that the act to regulate commerce did not intend to include such bridges as independent carriers or "railroads" coming within the purview of the law.

The Ohio & Mississippi Railway Company neither owns nor operates any connecting line with respondent. It has no authority, either from the state of Kentucky or the city of Louisville, to connect with respondent at any point. Under its contract with petitioner it has no right to use petitioner's tracks south of Hardin and Bank streets, or to the petitioner's connection with respondent's road, at Seventh street and Magnolia avenue. What, then, is or was the real relation which petitioner sustains to the Ohio & Mississippi Railway Company in respect to freights which the latter transports from the north side of the Ohio river to its yard in Louisville, and which petitioner has tendered and seeks to have interchanged with respondent at its Seventh street and Magnolia connection? The case of the car tendered on the 12th of September, 1888, will serve to illustrate this relation. That car was brought by the Ohio & Mississippi Railway Company over its road, including said bridge as a part thereof, to said company's yard in Louisville,—the southern terminus of its lines. It was then placed on the track of petitioner, who, for a switching charge of one dollar, to be paid by the Ohio & Mississippi Railway Company, transferred the car to said Seventh street and Magnolia connection, and requested respondent to receive it there. The service performed was wholly within the limits of Louisville. The charge for that service was not made for the transportation of the goods contained in the car, but simply for switching the car itself. Upon what principle is petitioner to be held or regarded as a common carrier, either of this car or of its contents? It was transferred under the obligation of its contract with the Ohio & Mississippi Railway Company to perform the service for one dollar. It was under no public duty to do such switching for any common carrier. It could not be required, aside from its agreement, to perform such service; and in performing the same it assumed none of the responsibilities of a common carrier, but only those of a switchman moving the vehicle in which the Ohio & Mississippi Railway was transporting its traffic. In respect to cars or traffic thus handled, petitioner can only be regarded as a switchman or transfer company. In the performance of such service it is no more a common carrier of interstate commerce or traffic, within the provisions of the law, than a city transfer company which checks a passenger's baggage at the hotel where it is received, and carries it, for an agreed compensation. to the station of the railroad over which it is to be transported into another state. The act to regulate commerce does not extend to such agencies, or embrace such transfer companies, nor can they invoke the provisions of said act in their behalf, or in behalf of those whom they thus serve. The Ohio & Mississippi Railway Company could readily.

have effected the delivery of said car (tendered by petitioner on the 12th of September, 1888) at respondent's Ninth and Broadway yard, through connections via the Short Route Transfer, the Chesapeake, Ohio & South-western, and the Jeffersonville, Madison & Indianapolis lines, reaching and extending up Fourteenth street to Maple and Tenth streets, at a cost of two dollars; or it could have reached respondent's yard at First and Water streets, over the Short Route Transfer Company's line, at a charge of one dollar. Under its contract with petitioner it paid for cars switched to said Seventh street and Magnolia connection one dollar per car, mak-ing a saving to itself of one dollar per car, in going to that point, rather than to the Ninth and Broadway yard; but in pursuing this course for the benefit of itself and petitioner there is imposed upon defendant, if it is compelled to accept such cars at said Seventh and Magnolia connec-tion, an extra expense of more than one dollar, in keeping some one at said point to inspect and receive such cars, and in addition thereto the cost of switching the same to said Ninth and Broadway yard, to be put into proper trains for destination. The interchange of traffic between the Ohio & Mississippi Railway Company and respondent at the latter's Ninth and Broadway yard, which is entirely practicable, and where re-spondent is entirely willing to make such interchange, would deprive petitioner of its switching charge of one dollar, and would increase the cost to the Ohio & Mississippi Railway Company to the extent of one dollar per car; and this benefit to the one, and increased cost to the other, without regard to the extra expense imposed upon the respondent at one point over the other, discloses one of the objects sought to be ef-fected, in seeking to force or compel an interchange at the point of con-nection selected by petitioner for its own convenience. But what public interest is to be subserved in aiding the petitioner to accomplish this ob-ject, or what bearing it has upon interstate commerce, which the act of congress undertakes to regulate, is difficult to perceive. It is, however, certain that the business thus transacted by petitioner does not make it, in law or in fact, a common carrier of interstate traffic. It is equally certain that petitioner is not a common carrier of that class of interstate freight which it solicits for railroads, either under express or implied agreement, and for which such roads furnished it with cars, for the transfer of which over its bridge petitioner charged and collected bridge-tolls only. The law does not require respondent or any other railroad company to keep up such an arrangement with petitioner as to continue to supply it with cars in order to obtain such traffic; thus making peti-tioner its soliciting or collecting agent in order to protect its interest in securing tolls for its bridge. Aside from the service performed by peti-tioner in these two classes, there is nothing in its business, as actually conducted, to sustain its claim to be even a *de facto* common carrier of interstate freight traffic. The petitioner and the Louisville Bridge Com-pany occupy precisely the same position and character,—they both charge tolls for the use of their bridges. They differ in the manner of doing business in this: that petitioner, in addition to its bridge-tolls, collects, in certain cases, for the services performed in making transfers

of cars, a switching charge, which the Louisville bridge does not make against the railroads using its bridge. Neither of them are, in law or in fact, common carriers of interstate traffic within the scope and meaning of the first section of the act to regulate commerce; and neither can invoke the provisions of that law to compel railroad companies to transact business with or through them. Between such a bridge company as petitioner and railroad carriers of the country the law establishes no such reciprocal relations, duties, and obligations as require the latter to form business connections with the former. We accordingly rule this third proposition against the petitioner.

The fourth point presented in this case, which is whether petitioner's connection with respondent's road at Seventh street and Magnolia avenue, in Louisville, is a proper, suitable, and convenient place for the interchange of traffic between them and the railroads using petitioner's track, and whether respondent's refusal to interchange at said point is an unreasonable and unjust discrimination against petitioner, and the carriers using its track, involves questions both of fact and law. We think it clear that petitioner cannot, either in its own behalf or in behalf of railroads using its bridge, assert any valid right to an interchange of business with respondent at said point, under the eighteenth section of the latter's charter, which authorizes other railroads to make connections with its line of road. It is settled by the case of the *Shelbyville R. Co.* v. *Louisville, etc., R. Co.*, 82 Ky. 541, and *Atchison, etc., R. Co.* v. *Denver, etc., R. Co.*, 110 U. S. 681, 4 Sup. Ct. Rep. 185, that the connection thus authorized is a physical, and not a business, connection, requiring an interchange of traffic at the point of junction. Petitioner's claim must therefore be founded, if it has any existence in law, upon some provision or requirement of the act to regulate commerce. Counsel for petitioner accordingly rely upon the second clause of the third section, in connection with the seventh section of said act, as sustaining petitioner's right to demand and require an interchange of traffic with respondent at said junction. The seventh section of the law makes it unlawful for any common carrier, subject to the provisions of the act, "to enter into any combination, contract, or agreement, expressed or implied, to prevent, by change of time-schedule, carriage in different cars, or by other means or devices, the carriage of freights from being continuous from the place of shipment to the place of destination; and no break of bulk, stoppage, or interruption made by such common carriers shall prevent the carriage of freights from being and being treated as one continuous carriage from the place of shipment to the place of destination, unless such break, stoppage, or interruption was made in good faith, for some necessary purpose, and without any intent to avoid or unnecessarily interrupt such continuous carriage, or to evade any of the provisions of this act." The facts show no violation of this provision of the law on the part of respondent. The contracts which it had with several railroads when the act to regulate commerce went into operation, and which still continue in force, are in nowise inconsistent with the things forbidden by this section, and there is no pretext for saying that defendant has since the pas-

sage of the interstate commerce act entered into any combination, contract, or agreement "to prevent, by change of time-schedule, carriage in different cars," or by other means or devices, the carriage of freight from being continuous. It has made no change in its method of doing business, indicating the slightest intention of violating the provisions of said section, and petitioner cannot, and does not in his petition, assert any such claim. Its right of interchange must therefore rest alone upon the second clause of the third section of the act, which provides that "every common carrier subject to the provisions of this act shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers and property to and from their several lines and those connecting therewith, and shall not discriminate in their rates and charges, between such connecting lines; but this shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business." Neither this nor any other provision of the law requires of the common carrier of interstate commerce the duty of either forming new connections or of establishing new stations for the reception and delivery of freights. The act to regulate commerce deals with such common carriers as it finds them, and leaves to them full discretion as to what extensions they will make of their lines, the connections they may form, and the yards and depots they may choose to establish. When railroad companies, in compliance with their charter obligations, have provided themselves with convenient, suitable, and ample stations and depots for the accommodation of their business, the law imposes upon them no duty, either to the public or other railroad lines, of making new stations, yards, or depots, even though such additional constructions might be for the convenience of the public, or of other carriers. Congress has certainly not undertaken, even if they possessed the power, to deal with such matters.

Now, it clearly appears from the foregoing statement of facts that respondent has already established, and has in use in the city of Louisville, four suitable, ample, and conveniently located and fully-equipped yards and depots, at one or the other of which it receives and delivers all freights arriving at or departing from Louisville, and makes all its interchanges of freights with other lines, furnishing to the latter at said places "all reasonable, proper, and equal facilities," not only for such interchange of traffic, but also "for receiving, forwarding, and delivering of passengers and property to and from its line or lines, and those connecting therewith," and does this without discrimination in its rates and charges as between such connecting lines. At petitioner's Seventh street and Magnolia avenue connection neither respondent nor petitioner has any yard, station, or depot; neither owns any ground there except respondent's right of way, 66 feet in width, on which its double main tracks are located; neither has any buildings, sheds, or platforms there for the reception and accommodation of freights to be handled and exchanged at that point; nor has either of them any clerks or employes stationed there for

the inspection of cars, receipting for freights, etc. Without such accommodations, and without the employment of such clerical force located there, an interchange of traffic at said point cannot be made in a proper and convenient way to either party. No authority is conferred upon the commission or upon this court to compel respondent to provide at that connection the same or equal facilities which it had provided at its regular, established yards and depots in Louisville, in order to effect an interchange with petitioner and the railroads using its bridge. Respondent neither receives nor delivers Louisville freights, whether local or through, at that point. In some instances it receives and delivers its own cars on and from certain private sidings in Louisville and at local Louisville rates; said private sidings being constructed and used under special contracts with the owners, and subject to respondent's right to remove or sever its connection with them at any time. Under said contracts such private sidings constitute, for the time being, portions of respondent's Louisville lines. The interchange sought by petitioner is entirely different. Louisville shippers or consignees of either local or interstate freight could not require respondent to receive or deliver their traffic at said Seventh street and Magnolia avenue connection, and in refusing to accept from or to deliver interstate traffic to private shippers or consignees at said point it could not be claimed that respondent was denying to them the same proper, reasonable, and equal facilities which it afforded to other shippers or consignees who delivered and accepted their through freight at its Ninth and Broadway yard and depot. If we assume that petitioner is a common carrier within the meaning of the law, can it or the railroads using its track in the manner heretofore stated properly demand or require of respondent to concede to it or them rights and facilities which respondent is under no obligation or duty to grant or provide for the owners and shippers of interstate commerce? This would be conferring upon common carriers engaged in transporting interstate traffic rights and privileges superior to those intended for the benefit of such commerce itself. The law was not designed to advance the interests of or to benefit the carriers, but was intended for the benefit and advantage of the commerce they transported, and the provisions of the act all look to that as its object and purpose. With no facilities at said Seventh street and Magnolia connection for the interchange of traffic, or for the receiving, forwarding, and delivering of property there, and being under no legal duty or obligation to provide such facilities at said point, upon what principle can it be successfully asserted that in declining to transact such business at such place respondent is refusing or denying to petitioner and the roads using its track "all proper, reasonable, and equal facilities" for the interchange of traffic, or for receiving, forwarding, and delivering of property, such as it has provided and affords to other connecting lines at its Ninth and Broadway yard and depot? Can it be properly said that such refusal involves any discrimination against petitioner and the railroads using its track, and seeking a connection at that point, with respondent, or against the traffic it or they may handle? In refusing to transact business with petitioner at Sev-

enth street and Magnolia avenue junction, while interchanging with other connecting lines at Ninth and Broadway station, is respondent making or giving "any undue or unreasonable preference or advantage" to the latter companies, or the traffic they transport? An affirmative answer cannot be made to these questions, unless the third section of the commérce act is construed to mean that whatever facilities a railroad company engaged in interstate traffic may furnish or provide for the interchange of business with connecting lines at any one place, such as its regularly-established and properly-equipped depot, it is bound to provide for any and all other railroads, at such other and different points as they may select in making their connection. The section does not admit of this construction. It obviously means that where a railroad subject to the provisions of the act has provided and established at any given place its facilities in the shape of yards, stations, and depots for the interchange of traffic or for the receiving, forwarding, and delivering of passengers and property, and there affords such facilities to some of its connecting lines, it shall not deny to other connecting lines at that point the same proper, reasonable, and equal facilities for such interchange, or for receiving, forwarding, and delivering of property to and from such other connecting line. The question, therefore, as to what constitutes reasonable, proper, and equal facilities necessarily involves a consideration of the place, accommodations, terms, and conditions at and under which facilities for interchange are sought, as compared with those where such interchange is conceded or afforded. It by no means follows, because certain facilities for the interchange of freight are furnished by a railroad to another connecting line or lines at one point, upon certain terms, conditions, and considerations, and where ample accommodations for the transaction of such business are provided and maintained at the joint expense of the companies using them, that another company making a physical connection with the road furnishing such facilities at another, different, and distant place is entitled to demand at said different point of connection the same or equal facilities. The company making the physical connection at a point other than that at which the established road has already provided its facilities, and conducts its interchange with other connecting lines, cannot demand or require an interchange of freight at such point of physical connection, without first furnishing at such point reasonable and proper facilities for the interchange sought. It cannot rely upon the terminal facilities at another point of the road with which it has formed the physical connection; nor can it compel the road with which the connection is made to join with it in the expense of providing at that point the facilities necessary and proper for the interchange. In saying that petitioner, or other road in its position, could not properly require an interchange at the new point of physical connection before it had first provided reasonable facilities there for transacting the business incident to an interchange of traffic, we do not mean to be understood as holding that, after providing such facilities at the point of connection, it could then lawfully require respondent to interchange traffic with it and the railroads using its tracks at that place. We do not

pass upon that question now, as it is not involved in the present controversy.

It is perfectly manifest from the location of the said Seventh street and Magnolia connection, and from the lack of all suitable and proper accommodations there for conducting the business involved in the interchange of freights, and from the manner in which such freight, whether in carload or broken lots, would have to be handled by respondent, that, if respondent is required to furnish at that point all proper, reasonable, and equal facilities, or, as required by the order of the commission, "the same equal facilities" which it furnishes and affords to the lines connecting with it at Ninth and Broadway yard, petitioner will thereby secure benefits and advantages superior to those conferred upon any other connecting line or lines, and largely, if not entirely, at respondent's expense. The order of the commission imposes no terms and conditions under which the interchange at said connection shall be made. Petitioner is not required to pay respondent anything for switching services which it will be compelled to perform in interchanging, or any rental for the use of its terminal facilities at Ninth and Broadway, where the freights, both in car-loads and broken or mixed lots, have to be transferred, and put into proper trains. Neither is petitioner required to bear any portion of the expense of handling the traffic at said yard; and in seeking the aid of this court to compel obedience to said order, or to enforce its rights, petitioner makes no offer to compensate respondent for such services and expenditures. The commission did not, perhaps, have the authority to impose such terms and conditions upon the petitioner; nor has this court either the right or the necessary *data* to settle and adjust those matters, which are the subject of private contract and arrangements between the parties. But, without the imposition of such terms and conditions, it is clear that petitioner and the railroads using its tracks and seeking an interchange at said connection will secure, without cost to themselves or compensation to respondent, services, and the benefit of facilities and of employes, for which other connecting lines interchanging at other places make respondent compensation, and bear their proportion of the terminal expense. The law never contemplated such results. No provision of the interstate commerce act confers equal facilities to connecting lines under dissimilar circumstances and conditions. On the contrary, even as to interstate commerce itself, the distinction is recognized throughout the law between discriminations and preferences which are just and reasonable and those which are unjust and unreasonable, according as they are made or given under similar or dissimilar circumstances and conditions. All discriminations and preferences are not forbidden or made unlawful; but only such as are unjust, or undue, or unreasonable, are prohibited. In each and every case, therefore, the question whether a discrimination is unjust, or a preference is undue or unreasonable, either as to the common carrier or the commerce it may transport, involves a consideration of the circumstances and conditions, under which such discrimination or preference is made or given. Our conclusion upon this fourth proposition is that said Seventh street and Magnolia avenue connection is not a

proper, suitable, and convenient point for the interchange of freights between respondent and petitioner and railroads using its tracks, and that in declining to deliver and receive freight at that point to and from petitioner respondent is neither discriminating improperly against petitioner and the carriers using its tracks, nor giving the roads with which it does interchange traffic at the Ninth and Broadway yard any undue or unreasonable preference or advantage.

· Upon the fifth question presented, viz.: Does the law impose upon respondent the duty of making an interchange with petitioner at said connection, if such interchange of traffic involves the use by petitioner and the roads using its bridge of the tracks and terminal facilities of respondent, or subject respondent to expense over and above what it incurs in interchanging traffic with other railroads at its regular and established yards in Louisville?—little need be said. An interchange at that connection in its present situation, with no buildings, sheds, platforms, or any facilities whatever for the proper care, protection, and handling of freight, and with no clerks or employes stationed there to look after and attend to the business, cannot possibly be carried on without requiring respondent either to concede the use of its tracks and terminal facilities to petitioner and the roads using its tracks, or without imposing upon respondent the trouble, inconvenience, and expense of handling such traffic, both that received and delivered, in the manner above stated,—that is, transferring it to said Ninth and Broadway depot, and then rehandling, reloading or placing it into proper trains. Petitioner's superintendent, A. J. Porter, properly states that it is a physical impossibility to carry on an interchange of traffic at that point between the parties without using each other's tracks. It does not admit of any question that neither the commission nor this court have any authority to require respondent to concede the use of its tracks and terminal facilities in order to accomplish the desired interchange. Nor can this court or the commission impose upon respondent the duty of making such interchange at its own expense, over its own tracks, with its own engines, at its own yard, and with its own employes. Other railroads connecting with respondent, and interchanging traffic with it at its regular yards, contribute their proportion of the expense incident to such interchanges, and compensate respondent for its services in handling their freight in a less inconvenient way, and for a shorter distance, than respondent would be necessarily compelled to handle the traffic received from or to be delivered to petitioner. The terms under which other railroads connecting and interchanging with respondent at said Ninth and Broadway yard are allowed to use its tracks and terminal facilities, and have their freights handled and transferred, are arranged by mutual agreements, which secure to respondent compensation for services and for use of its improvements, and provide for prorating the expense incident to such interchanges. Is it either legal or equitable to require respondent to handle traffic for petitioner upon terms less favorable? And, if the parties cannot themselves agree upon such terms, can this court make an agreement or contract for them in the matter? · We think this is beyond

the province of any court or commission, under existing law, and under circumstances such as exist in this case. An interchange on the main line or tracks of a railroad is essentially different from such an interchange at its regular yard, where such business is usually transacted, and where suitable conveniences and facilities are provided. If respondent is required "to allow and afford" to petitioner at said Seventh street and Magnolia connection "the same equal facilities" which it affords to railroads connecting with it at its established yards, without prescribing the terms, conditions, and considerations under or upon which such facilities shall be afforded, it is manifest that petitioner will secure not equal, but exceptional, advantages over all other connecting lines; and it is furthermore clear from the foregoing statement of facts that such exceptional advantages will involve either the use of respondent's tracks and terminal facilities by petitioner, or will impose upon respondent expenses and inconveniences, and the performance of services without compensation, such as it does not perform or incur in effecting its interchanges with the carriers connecting with it at the Ninth and Broadway yard. If, under such circumstances, an interchange can be demanded and enforced at a physical connection with respondent's main track, one mile and seventeen one-hundredths of a mile from its regular depot, at what distance from such depot may such an interchange be properly refused? If the principle involved in the requirement of the commission, or asserted in the claim of petitioner, is correct, as applied to the present case, where shall the line be drawn in respect to the distance from its regular yards at which respondent can be compelled to allow and afford to other roads intersecting or joining its main track "the same equal facilities" which it affords to other connecting lines, which reach and interchange business at such established yards? The law furnishes no answer to those questions; and, if the right herein asserted is well founded, this court could not fix the limitation upon its application to any distance.

The sixth inquiry suggested above is: "Does the interstate commerce law, rightly construed, require respondent not only to interchange traffic at said point of connection (Seventh street and Magnolia avenue) with petitioner and the railroads using its tracks, but also to afford and concede to them on such interchange of business the same through routeing, and upon the same joint through rates which respondent has, by contract, arranged and agreed upon with certain railroads entering Louisville from the north side of the Ohio river? In other words, does said act require that, if respondent has entered into traffic arrangements with one or more railroads connecting with it over the Louisville bridge for the joint through routeing of business at and upon joint through rates, to be apportioned between them, it shall concede to or make with any and all other roads engaged in interstate commerce, and connecting with it at other and different points, and running in different directions, the same or similar arrangements for through traffic, and upon the same joint through rates? And, if this is required by the law, is such requirement valid, and within the constitutional power and authority of congress to

regulate commerce among the states? Aside from the place at which the interchange of traffic is sought, the present controversy clearly involves the question as to whether such interchange shall be effected at local Louisville through rates, or at such through joint rates as respondent has arranged with the roads connecting and interchanging with it over the Louisville bridge. Respondent is now, and has always been, willing to interchange freights with petitioner and the Ohio & Mississippi Railway Company, when such freights are tendered at its proper yards, and it is allowed to charge for the transportation thereof its local Louisville rates to destination. The petitioner, and the Ohio & Mississippi Railway Company, since the latter's abandonment of the Louisville bridge and its contractual relations with the Louisville & Nashville Railroad Company, has not been willing to concede to respondent the right of charging local Louisville rates on the freight they sought to have interchanged. Duncan, the general freight agent of the Ohio & Mississippi Railway Company, states that his company could not interchange traffic with the Louisville & Nashville Railroad Company on these terms, which would leave the Louisville & Nashville Railroad Company in position where it could decline "to pay any of our charges on freight that we offered them at Louisville rates." The agents and officers of petitioner also state that they expected respondent to accept and carry at through joint rates the freight as to which interchange was sought. Petitioner claimed before the commission, for itself and the railroads using its tracks, that it was entitled, at its said connection, to an interchange of freight upon the same terms as to through routeing and through joint rates which respondent made with other railroads using the Louisville bridge, and that respondent, in refusing such routeing and rating, was discriminating against it. If, therefore, the question of rates was not passed upon by the commission, or covered by its report and order, one of the real points in controversy between the parties was not disposed of. To leave it open, as suggested by counsel for petitioner, will only be to invite and necessitate further litigation between the parties; for if this court were to issue its mandate requiring respondent to obey the award of the commission, expressed in the general and indefinite terms of "ceasing its refusal to receive traffic offered at said connection, and of allowing and affording to petitioner at said point 'the same equal facilities' which respondent affords to other common carriers at the points of connection with their lines respectively," the question would come back to the court at once as to whether "the same equal facilities" included through routeing and through joint rates, such as respondent makes with other carriers connecting with it, or is satisfied with Louisville routeing and local Louisville rates, to destination of freight offered for interchange. Or if the court should be in error in its conclusions that said Seventh street and Magnolia avenue connection is not a proper, suitable, and convenient point for the interchange of traffic between the parties, and that such an interchange at that connection could not be effected without either the use by petitioner of respondent's track and terminal facilities, or the imposition upon respondent of expenses and burdens such as it is

not required to incur in conducting its interchanges of business with other railroads reaching its Ninth and Broadway yard, then the question of through routeing and through joint rating is a necessary and material matter for determination in the present controversy.

The first section of the act to regulate commerce provides that "all charges" for services rendered by common carriers subject to the provisions of the law "shall be reasonable and just," and prohibits and declares unlawful "any unjust and unreasonable charge." This is the sole requirement of the law upon the subject of rates which common carriers subject to the provisions of the law may demand for the transportation of interstate traffic. The second section of the act clearly defines what shall constitute the "unjust discrimination" which is prohibited. The third section prevents the making or giving of any undue or unreasonable preference or advantage to any firm, company, person, corporation, locality, or traffic, or the subjecting of any person, company, firm, corporation, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage; and by its second clause requires common carriers to afford all reasonable and proper and equal facilities for the interchange of traffic, and for the receiving, forwarding, and delivering of passengers and property between their lines and those connecting therewith, and prevents them from discriminating in their rates and charges between such connecting lines, but without requiring any such common carrier "to give the use of its tracks and terminal facilities to another carrier engaged in like business." Now, under this last limitation upon, or qualification of, the duty of affording all reasonable, proper, and equal facilities for the interchange, or for the receiving, forwarding, and delivering of traffic to and from and between connecting lines, it is clearly left open to any common carrier to contract or enter into arrangements for the use of its tracks and terminal facilities with one or more connecting lines, without subjecting itself to the charge of giving an undue or unreasonable preference or advantage to such lines, or of discriminating against other carriers who are not parties to, or included in, such arrangements. No common carrier can therefore justly complain of another that it is not allowed the use of that other's tracks and terminal facilities, upon the same or like terms and conditions which, under private contract or agreement, are conceded to other lines. It is equally clear from the provisions of section 6 of the act that two or more common carriers may lawfully enter into contracts or agreements for the establishment and operation of through routes at or upon joint through rates. Copies of such contracts and agreements have to be filed with the commission. "And in cases where passengers and freight pass over continuous lines or routes operated by more than one common carrier, and the several common carriers operating such lines or routes establish joint tariffs of rates, or fares, or charges, for such continuous lines or routes, copies of such joint tariffs shall also in like manner be filed with said commission." Such joint rates, fares, or charges on such continuous lines are to be made public when directed by the commission; and the failure of any common carrier to comply with such requirements

will authorize this court, upon the application of said commission, to restrain such common carrier from receiving or transporting property among the several states, etc. If, in the exercise of the right thus impliedly, if not expressly, recognized, a common carrier, by private arrangement, forms a through route, and establishes joint through rates, fares, or charges, with certain connecting lines, is it compelled to concede to all other connecting railroads the same or equal through rates on traffic which the latter may offer for transportation? It is settled by the case of *Atchison, etc., R. Co.* v. *Denver, etc., R. Co.*, 110 U. S. 668, 4 Sup. Ct. Rep. 185, that neither at common law nor under the constitution of Colorado, (section 6,) providing that all individuals, associations, and corporations shall have equal rights to have persons and property transported on any railroad in this state, and no undue or unreasonable discrimination shall be made in charges or facilities for transportation of freight or passengers within the state, does the refusal of a common carrier to make through traffic arrangements at or upon joint through rates with one connecting railroad company, such as it makes or enters into with another connecting line, constitute any undue or unreasonable discrimination in charges or facilities. That decision is conclusive of the present question, unless some provision of the act to regulate commerce has expressly or by clear implication provided otherwise. It is insisted for petitioner that such is the case, and the second clause of section 3 of that act is relied on, in connection with section 5258, Rev. St. U. S., (embracing the act of June 15, 1866,) as establishing a different rule and regulation from that announced in the above decision. We think it is very manifest that section 5258, Rev. St., which imposes no duty, but merely permits or authorizes the carriage of traffic from one state to another, and, to that end, the formation of continuous lines, evidently by mutual agreement, does not sustain petitioner's proposition. That section was in full force when the case of *Atchison, etc., R. Co.* v. *Denver, etc., R. Co.*, and *Railway Co.* v. *Richmond*, 19 Wall. were decided, and was not considered by the supreme court as conferring any right to a through route and a joint through rating. Is it a public duty imposed by the act to regulate commerce that every common carrier, subject to the provisions of that law, shall concede or afford through routeing and through rates to all connecting lines, whenever and so long as it voluntarily makes or enters into such arrangements with any connecting lines?

After a careful examination of the act, and the arguments of counsel, and authorities cited, we fail to discover any such requirements. In the report of the commission in the case of *Railroad Co.* v. *Railroad Co.*, 1 Interstate Commerce Com'n Rep. 94, it is well and properly said, in reference to through tickets, that "such tickets very evidently are a great convenience to travelers, and perhaps to connecting roads; but they are a part of the voluntary arrangements for business purposes, like joint tariffs, interchange of cars, and common use of depots. It being, therefore, under our statute, matter of mutual agreement, whether coupon or through tickets shall be sold by a railroad company over roads of other companies, it follows that the form of such tickets, and the manner of

their sale, are also matters of agreement by the companies interested. If companies can agree upon their tariffs, the form of their tickets, and how they shall be sold, they have the right to do so, and by such agreement become interstate carriers; but if they cannot agree, the act does not undertake to coerce them to do business together upon terms that may be justly objectionable or injurious." It will hardly be insisted that a different rule applies in respect to through freight traffic, and joint through rates or charges, the arrangement for which, as well as the forms of the bills of lading, and the apportionment to be made of such joint tariff rates, and of losses or damage to freights in course of transit, are all matters of private agreement. Such arrangements, which usually include the reciprocal interchange of cars and the use of each other's tracks and terminal facilities, are prompted by considerations varied and complex, as shown in the above statement of facts. In some instances, and between some companies, they may be mutually desirable and beneficial, while in other cases, and with other connecting lines, they might be prejudicial and injurious to the interest of one or both. Can companies in the latter situation properly claim as matter of right what the former have acquired under and by virtue of private contract and arrangement? No provision of the law, rightly construed, sanctions or supports such a proposition. The statute does not undertake to create between connecting lines such an agency or *quasi* partnership relation as is necessarily involved in agreements or arrangements for the establishment of through routes, and the making of through rates. As such arrangements exist by contract, express or implied, the fact that a common carrier enters into them, with one or more connecting lines, does not impose upon such carrier the duty or obligation to make the same or like contracts with all other lines. The law possesses no such elastic or expansive quality as to reach or bring within its operation, in favor of all common carriers subject to its provision, every varying right and privilege which any other carrier may acquire or concede by private contract not in conflict with the act. No authority is conferred upon common carriers of interstate commerce to issue through tickets to passengers, or through bills of lading for property, at through rates, over connecting-lines, in the absence of such arrangements between the companies. Neither is the commission invested with authority to establish through routes, or to fix through rates, between connecting lines. The English act of 1873, amendatory of the act of 1854, did confer such authority, in providing that "the said facilities to be afforded are hereby declared to, and shall, include the due and reasonable receiving, forwarding, and delivering by any railway company and canal company, at the request of any other such company, of through traffic to and from the railway or canal of any other such company, at through rates, tolls, or fares;" but in the apportionment of such through rates said act required the commissioners "to take into consideration all the circumstances of the case, including any special expense incurred in respect of the construction, maintenance, or making of the route, or any part of the route, as well as any special charges which any company may have been en-

titled to make in respect thereof." Our act to regulate commerce contains no such provision, and confers no such authority. The English cases under the act of 1873, cited by counsel, cannot therefore have any bearing upon the present case, and need not be referred to.

Looking at this question from another standpoint, we find that the law was intended, primarily, for the benefit of the interstate traffic, rather than for the advantage of the designated common carriers engaged in its transportation; and the latter, as the instrumentalities and agencies of commerce, can hardly assert rights and privileges under the statute, which could not be properly or lawfully claimed by such commerce itself. Let us, then, by way of illustration, and to bring out more distinctly the question under consideration, take the case of a shipper or consignor at Nashville, Tenn., wishing to have his goods transported to Cincinnati, Ohio. Could he legally require the Louisville & Nashville Railroad Company, not only to accept such shipment, but to route it over or via the petitioner's bridge and the Ohio & Mississippi Railway, and at the same through rates from Louisville to Cincinnati as respondent's own *pro rata* charge between said points would be if it carried the goods direct from Nashville to Cincinnati? Or could such shipper require respondent to route his goods in the way stated, at the same or equivalent through rates which respondent has established with connecting roads leading north from Louisville to Indianapolis, St. Louis, or Chicago? The Louisville & Nashville Railroad Company could not decline to accept and carry such goods to Louisville at its regular rates between Nashville and Louisville; but could it not properly decline the demand to route and rate them beyond Louisville to Cincinnati, on the ground that it had a direct line of its own to Cincinnati, over which the property could be carried by itself; that it had no arrangement or agreement with the Kentucky & Indiana Bridge Company and the Ohio & Mississippi Railway Company for such through routeing and through joint rating; and that between Louisville and Cincinnati it was a competing, and not a connecting, line with the Ohio & Mississippi Railway Company? Could the Nashville shipper successfully urge in support of his demand for such through routeing and rating that the Louisville & Nashville Railroad Company had existing arrangements with lines (other than the Ohio & Mississippi Railway Company) crossing the Louisville bridge, under which interstate traffic was carried at through rates between certain points? There can be but one answer to these questions. The law confers no such right upon the shipper, and imposes no such duty upon the common carrier. If Cincinnati is made the point of shipment, and the Ohio & Mississippi Railway Company is taken as the initial carrier, it is equally clear that, in the absence of any through traffic arrangement between the Louisville & Nashville Railroad Company and the Ohio & Mississippi Railway Company, a shipper at Cincinnati could not lawfully require the Ohio & Mississippi Railway Company to accept his goods, and issue a through bill of lading therefor to Columbia, Tenn., via the Kentucky & Indiana bridge, and via the Louisville & Nashville Railroad, at the same through rates from Louisville to Columbia which

the Louisville & Nashville Railroad Company would charge from Louisville to Columbia under its through rate from Cincinnati to Columbia. What the shipper of interstate commerce may not lawfully demand, the common carrier engaged in transporting such commerce may not lawfully require, of connecting lines.    In the absence of traffic arrangements between respondent and petitioner and the railroads using its tracks, the former has a right to treat freights tendered it at Louisville as local Louisville business, and charge for the transportation thereof its Louisville rates to destination; and in doing this no discrimination is made against said parties or the traffic they carry; nor does respondent make or give any undue or unreasonable preference or advantage to other lines, or the traffic they handle, with whom it has agreements for through routeing, and at through joint rates, which may be lower than its Louisville rates to the same points.    The service in the two cases is not the same or identical, as was settled in the case of *Railway Co.* v. *U. S.*, 117 U. S. 355, 6 Sup. Ct. Rep. 772, where the supreme court held that the service rendered by a railway company in transporting a local passenger from one point on its line to another is not identical with the service rendered in transporting a through passenger over the same rails.    There is nothing in the commerce act of congress to change this rule.    The effect of a through traffic arrangement between different companies is to extend a railroad's line, during the existence of such arrangement, to the point or points agreed upon; and over such extended routes it may charge, as a through rate, less than for transporting local traffic from one point to another on its own line, provided that in so doing the fourth section of the act is not violated.    The Louisville & Nashville Railroad Company is under no legal duty or obligation to extend its line across the petitioner's bridge to New Albany; and, if it was, petitioner has, by its contract of September 29, 1886, with the Ohio & Mississippi Railway Company, shut itself off from affording to respondent the same or equal facilities in the use of said bridge by having given the locomotives, cars, and trains of the Ohio & Mississippi Railway Company a preference over those of a similar class of other railroad companies that may use said bridge; so that it is not in a position, while that contract is in force, to grant or concede such traffic arrangements as it demands for itself and the railroads using its bridge.

While the Ohio & Mississippi Railway Company is not an actual party to this controversy, which this court is required " to hear and determine as a court of equity," it is, however, perfectly manifest that this proceeding, as well as that before the commission, is intended for the private benefit, not merely of petitioner, but of the Ohio & Mississippi Railway Company; and its object is to relieve the latter from the contract of June 5, 1872, in order that petitioner may secure from it the rental stipulated to be paid for the use of its bridge; the Ohio & Mississippi Railway Company not being bound by the contract of September 29, 1886, to pay petitioner "any tolls" thereunder until its liability for tolls, charges, or rentals under the contract of June 5, 1872, with the Louisville Bridge Company, is removed.    Now, the contract of June 5, 1872,.

which the Ohio & Mississippi Railway Company entered into with the Louisville Bridge Company and other railroad companies, including respondent, and in the maintenance and enforcement of which respondent has a direct business and pecuniary interest, was neither abrogated nor annulled by the act to regulate commerce. The provisions of that contract are not in conflict, but in strict conformity, with both the letter and spirit of the act of congress. Under the terms and operation of that contract, which is still in full force as against the Ohio & Mississippi Railway Company and all parties thereto, the Ohio & Mississippi Railway Company had and enjoyed all reasonable, proper, and equal facilities with any and every other railroad company entering Louisville from the north side of the Ohio river, and interchanging traffic with respondent. It voluntarily abandoned these facilities in 1888, changed its business to the petitioner's bridge, not in the interest of the public or of the interstate commerce it handled, but for its private benefit and advantage; and petitioner now seeks to secure for it, as well as for itself, the same terms and facilities which existed under the contract of June 5, 1872, and without subjecting either to the obligation of compensating respondent, or sharing in the expense of an interchange, as provided in the contracts of May 22, 1873, and May 16, 1888. The act to regulate commerce, no more than the act of June 15, 1866, (section 5258, Rev. St. U. S.,) was never intended to invade the domain of private contracts between common carriers, which were valid when made, and are not in conflict with the provisions of the law. In *Railroad Co.* v. *Richmond,* 19 Wall. 590, the supreme court says of such contracts, "that the observance of good faith between parties, and the upholding of private contracts and enforcing their obligations, are matters of higher moment and importance to the public welfare, and far more reaching in their consequences, than the public policy sought to be established in the facilitation of commercial intercourse among the states, which the act of June 15, 1866, aimed to promote." Under such circumstances as surround the parties, neither the Ohio & Mississippi Railway Company nor the petitioner, who, for private advantage, is co-operating with the Ohio & Mississippi Railway Company in trying to escape from the obligations of said contract of June 5, 1872, are in a position to commend themselves to the favorable consideration of a court of equity, and no strained construction of the law should be made in order to afford them or either of them, the relief they seek at the hands of the court. The law should be as liberally construed in favor of commerce among the states as its language will permit; but, when complaint is made, or relief is sought, solely or mainly in the interest of the common carriers engaged in the transportation of such commerce, the act complained of, or the right asserted, should not rest upon any doubtful construction, but should clearly appear to have been forbidden or conferred. But under no construction which can properly be placed upon the present case can it be maintained that a public duty is imposed upon respondent of interchanging traffic with petitioner and the railroads using its tracks, upon the same terms as to through routeing and through joint rates which it has, by private

agreement, established with other connecting roads using the Louisville bridge.

Having reached the conclusion that the act to regulate commerce, rightly construed, does not sanction nor support the affirmative of the proposition presented, it is not deemed necessary to go into any discussion as to the power of congress over the subject of rates which common carriers may charge on interstate commerce, or whether congress, under the power conferred by the constitution, to regulate commerce among the states, could require all connecting lines engaged in transporting such commerce to establish through routes, and make through joint rates, which should be equal between all such companies. No court has attempted to define the extent, limit, or scope of the power conferred by the constitution upon congress to regulate commerce among the states. The power is undoubtedly sovereign and exclusive. Prior to the passage of the interstate commerce act, this power and exclusive authority over the subject was only exercised—with the exception of regulations for the protection of passengers upon navigable waters, and the transportation of live-stock by railroads—through the judicial department of the general government in the way of restraining or annulling state legislation or action which undertook to interfere with, obstruct, or impose burdens or restrictions upon, interstate commerce. But the power is manifestly not confined or limited to this negative form of action upon the states. It clearly admits of affirmative exercise on the part of congress, as much as any other power granted by the constitution to the federal government. Chief Justice MARSHALL, in *Gibbons* v. *Ogden*, 9 Wheat. 1, gave this comprehensive definition of this power:

"It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in congress, is complete in itself; may be exercised to its utmost extent; and acknowledges no limitations other than are prescribed in the constitution. * * * If, as has always been understood, the sovereignty of congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign nations and among the several states is vested in congress as absolutely as it would be in a single government having in its constitution the same restrictions on the exercise of the power as are found in the constitution of the United States."

Possessing such sovereign and exclusive power over the subject of commerce among the states, it is difficult to understand why congress may not legislate in respect thereto to the same extent, both as to rates and all other matters of regulation, as the states may do in respect to purely local or internal commerce. But we are not called upon in the present case to say what would or would not come within this regulating power, for the existing law does not undertake to prescribe anything more upon the subject of rates than that they shall be reasonable and just. It does not undertake to require a common carrier, subject to its provisions, to establish through routes and through rates with all connecting lines, if it does so with one or more lines; and does not, as we construe its provisions, entitle petitioner to the relief which it seeks in this proceeding. For the foregoing reasons our conclusions upon the whole case are that

the order of the commission was not a lawful requirement, such as respondent is bound to obey, and that petitioner is not entitled to the relief which it seeks in this court. It is accordingly ordered and decreed that petitioner's bill or petition be dismissed at its cost, to be taxed, including in such costs an allowance of $600 to the referee, as compensation for his services in taking proof and making report herein.

BARR, J. I agree with so much of his honor's—Judge JACKSON's—opinion as decides the interstate commerce act constitutional, and that this court has original jurisdiction in this cause. I also concur with him in the opinion that the complainant is not a common carrier of interstate traffic, within the meaning of the interstate commerce act, and that there are not proper and suitable facilities for the interchange of traffic at the intersection of Seventh street and Magnolia avenue; but I do not concur in so much of his opinion as seems to indicate that complainant, or the railroads using its bridge, must bring their freight for interchange to one of the established depots of the Louisville & Nashville Railroad Company. On the contrary, I think the intersection of Seventh street and Magnolia avenue is a proper place for the interchange of traffic, if suitable platforms and other structures were erected. These necessary facilities should be furnished by the complainant or those demanding the interchange of traffic at that point, as they have no right to use either the track or terminal facilities of the Louisville & Nashville Railroad Company without its consent. Having concurred in the opinion that the complainant cannot obtain an interchange of traffic with the Louisville & Nashville Railroad Company, and that the petition must be dismissed, I do not wish to give an opinion as to the rates which should be charged as between common carriers in the interchange of traffic under and by virtue of the interstate commerce act, until a case arises which requires a decision.